**UNITED STATES of America**

v.

**Francisca Rosa VELASQUEZ, Appellant.**

No. 88–3652.

United States Court of Appeals, Third Circuit.

Argued March 3, 1989.

Decided Sept. 1, 1989.

As Amended Sept. 7, and Oct. 2, 1989.

Rehearing and Rehearing In Banc Denied Sept. 28, 1989.

K. Kay Shearin (argued), Wilmington, Del., for appellant.

William C. Carpenter, Jr., U.S. Atty., Edmond Falgowski (argued), Asst. U.S. Atty., Wilmington, Del., for appellee.

Before HIGGINBOTHAM, STAPLETON, and COWEN, Circuit Judges.

## OPINION OF THE COURT

COWEN, Circuit Judge.

On July 20, 1988, a jury found Francisca Rosa Velasquez ("Velasquez") guilty on one count of possession of greater than five kilograms of cocaine with intent to distribute, in violation of 21 U.S.C. § 841(a)(1), and one count of conspiracy, in violation of 21 U.S.C. § 846. On September 30, 1988, Velasquez was sentenced to 151 months in prison on both counts, to be served concurrently. Velasquez appeals her conviction on a number of grounds. For the reasons discussed below, we will affirm the conviction for possession but will reverse the conviction for conspiracy.

## I.

On February 8, 1988, at 11:10 a.m., Velasquez and a companion, Ivan Terselich ("Terselich") were driving a 1982 Ford LTD with Florida license plates northbound on Interstate 95 in Delaware. Corporal Robert Durnan ("Durnan") pulled the vehicle over for speeding, after clocking the vehicle at 62 miles per hour in a 55 mile per hour zone. At Durnan's request, Velasquez identified herself and produced the Ford's registration card, which indicated the car's registered owner to be one Javier Perez, residing at 401 Southwest 18th Avenue, Miami, Florida.

Durnan asked Velasquez to exit the car and accompany him to an area on the shoulder of the turnpike between the rear of her car and the front of his patrol car. He then explained that she was being stopped for speeding. He asked her where she was going, and she answered that she was traveling from Miami to Long Island for a few days vacation with her husband, seated in the car. She also stated that the Ford belonged to her cousin, although she was unable to provide his name. Durnan testified that Velasquez was nervous and stuttered.

Durnan then spoke with Terselich, who was still seated in the Ford. Contradicting Velasquez, Terselich stated that she was not his wife and that he was traveling from Miami to New York on business, not vacation. He stated that the car belonged to his friend named Lopez. Terselich also appeared nervous.

Durnan testified that he asked Velasquez to accompany him into his patrol car to talk because it was warmer and quieter than the shoulder of the highway. When they were seated in his car, Durnan asked Velasquez if she had any contraband in the Ford. She replied that she did not, and he asked her for permission to search the car. He testified that she replied, "Yes, you can search." Because he detected a Spanish accent in Velasquez's voice, Durnan produced a written "Consent to Search" form in Spanish. He completed the form, explained it to Velasquez, and asked her to read and sign it. Velasquez examined and signed the form.

After obtaining Velasquez's consent to the search, Durnan asked Terselich to step from the vehicle. He first searched the passenger area of the car. He then obtained the keys from Terselich, who had removed them from the ignition while Durnan was interviewing Velasquez. Durnan opened the Ford's trunk and, within ten seconds, recognized a false floor in the trunk. While the underside of the car revealed a large well beneath the trunk area, the floor on the inside of the trunk was flat.

Durnan testified that, at this point, he believed that the trunk contained a secret compartment which concealed contraband, such as illicit drugs, weapons or money. He also believed that the secret compartment could only be reached by removing the gas tank, and he did not have the tools or facilities to do so. At approximately 11:20 a.m., Durnan advised Velasquez and Terselich that they were being detained under Delaware's two-hour "detention" statute, Del.Code Ann. tit. 11, § 1902, and had them handcuffed and, along with the Ford, transported to Delaware State Police Troop 6. On arrival at the station, Velasquez was placed in a holding area by the main desk.[1]

1. There is some confusion as to whether Velas- quez was read *Miranda* warnings en route to the

The Ford was placed on a lift, and Durnan attempted to remove the gas tank to get at what he believed was the secret compartment. He was unable to do so, because the filler tube which would normally flow into the gas tank had been altered to go into the secret compartment, and this hindered his efforts. He then took the vehicle down from the lift, opened the trunk, and removed a loose rug from the floor of the trunk. He noticed on the trunk floor a six inch-by-ten inch hinged door, which was locked. He pried the door open with a crowbar and immediately observed block packages, twenty-one in all, wrapped in a manner which Durnan recognized was customary to cocaine smuggling. On closer inspection and testing, the packages were found to contain twenty-one kilograms of cocaine.

After discovering the cocaine, Durnan testified that he read Velasquez *Miranda* warnings from a card, reading slowly, in English, and stopping after each sentence to ask if she understood. She answered in the affirmative each time. Durnan also testified that he provided Velasquez with a card containing the *Miranda* warnings in Spanish, which she held and appeared to read. Durnan then left the detention room and contacted Agent William Glanz ("Glanz") of the Drug Enforcement Agency ("DEA").

Between 12:30 and 1:00 p.m., Agent Glanz arrived at troop 6. In an interview room, Durnan introduced Glanz to Velasquez. Glanz showed Velasquez his credentials and explained that he was a federal agent with the DEA and wanted to talk with her. Velasquez immediately indicated that she did not wish to be questioned and that she would like to speak with a lawyer. The conversation ended at this point, and Durnan returned her to the holding room. Durnan and Glanz began attending to administrative details in another part of the building.

One half hour later, Durnan went to the holding area to take Velasquez into federal court to have her bail set by a United States Magistrate. Velasquez told Durnan that she wanted to speak to the federal agent again. Durnan brought Velasquez back to the interview room to speak with Glanz. According to Glanz, she asked him, "What is going to happen?" He explained, truthfully, that she would be brought before a magistrate and her bail would be set, and that the minimum mandatory sentence for possession of in excess of five kilograms of cocaine was ten years. This information was correct.

Velasquez then asked what would happen to her companion Terselich. Glanz testified that at this point he believed she was initiating a conversation about the investigation and that she was thereby waiving the *Miranda* rights which she had previously invoked. Glanz then provided her with misinformation. He told Velasquez that Terselich was being released because he had given a statement against Velasquez and that he was going to testify against her. Glanz also asked her if she wanted to give Terselich her belongings, because he would be traveling back south that evening.

Velasquez did not respond to these statements. Glanz then asked if she would like to tell her version of the story, and she responded by asking him what he wanted to know. He inquired as to who owned the car, to which she replied that she did not know. He then asked her how she came to be driving a car containing a large amount of cocaine. Glanz testified that she stated that she had been paid $10,000 to drive the drugs north, was afraid to make the trip alone, and was paying Terselich $5,000 to accompany her.[2] When asked about Terse-

---

station. The district court determined not to credit evidence from Officer Durnan that he had been told by the officer transporting Velasquez that he had given her *Miranda* warnings in the car. This has not been challenged on appeal, and thus on this record we will not consider any *Miranda* warnings which might have been given in the car. This issue does not affect our disposition of the case in any way.

2. Glanz quoted Velasquez differently at various points in his testimony, once quoting her as saying that she had been promised the money to drive the "car" north, and at other times quoting her as saying that she had been paid to drive the "drugs" north. When questioned on this point during cross-examination, however, he asserted that she had in fact used the word "drugs" and

lich's knowledge of the drugs, she did not respond directly, but shook her head several times and stated, "This is all my fault, this is all my fault."

Glanz testified that he next asked Velasquez what she had planned to do with the drugs when she arrived in New York. She responded that she was to call Miami to receive a New York phone number, and that she was to then call that New York number and make arrangements to transfer the drugs. When asked about the number, she did not respond. At this point, Glanz terminated the interview, which had lasted ten to fifteen minutes, because of the need to bring Velasquez before a magistrate that afternoon.

Velasquez and Terselich were each indicted on two counts: possession with the intent to distribute more than five kilograms of cocaine, and conspiracy "with each other and with persons presently unknown to the grand jury" to possess cocaine with the intent to distribute. App. at 11. After pleading not guilty to the indictment, on March 28, 1988 Velasquez filed a motion to suppress the cocaine and her statements and for the determination of her competency to stand trial. The court denied the motion after a hearing and, as to the statements, after briefing.

On March 28, 1988, Velasquez's counsel submitted to the district court the affidavit of Jorge A. Pereira–Ogan, M.D., in which Ogan rendered the opinion that Velasquez was unable to assist properly in her defense. The judge ordered that Velasquez be committed to a federal facility to undergo psychiatric examination pursuant to 18 U.S.C. § 4241 to aid in determining her competency to stand trial, and to undergo an evaluation pursuant to 18 U.S.C. § 4242, to aid in determining any question regarding her sanity at the time of the offense. From April 14 to June 15, 1988, Velasquez was held at the Federal Correctional Institute in Lexington, Kentucky. The forensic team which performed the court-ordered evaluation recommended that Velasquez was competent to stand trial. On June 29, 1988, after a hearing, the court entered an order finding Velasquez competent to stand trial.

A jury trial of Velasquez and co-defendant Terselich commenced in the district court on July 18, 1988, but on that day a mistrial was declared when the first witness testified to a statement that the court had previously excluded under *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). On July 19 and 20, another trial was held, resulting in a jury verdict finding Velasquez and Terselich guilty as charged in both counts of the indictment. Velasquez' motion for acquittal or, alternatively, for a new trial was denied. On September 30, 1988, she was sentenced to ten years for each offense, to run concurrently. She filed a notice of appeal with this Court on the same date. We have jurisdiction pursuant to 28 U.S.C. § 1291.

## II.

Velasquez raises three major arguments on appeal. First, she argues that the warrantless stop and search of the car on the highway was illegal and that the court erred in denying her motion to suppress the cocaine. Second, she argues that Delaware's two-hour detention statute, under which she was held immediately prior to her arrest, is unconstitutional and therefore the court erred in denying her motion to suppress both the cocaine and the incriminating statement which she made while in police custody. Third, she argues that her statements made to the DEA agent were inadmissible because she had already invoked her right to counsel, and had not waived that right prior to making the statements. Because these are issues of law, our review is plenary.

### A.

#### 1. *The stop*

Velasquez first argues that the warrantless stop and search of the car were unlawful, and that because the cocaine was the fruit of that unlawful stop and search, the

his other versions of her statement were simply     slips of the tongue. *See* app. at 408–10, 412–13.

district court erred in denying her motion to suppress the cocaine. The fourth amendment to the Constitution states that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated...."

The Supreme Court has determined that stopping an automobile and detaining its occupants constitute a seizure within the meaning of the fourth amendment. *Delaware v. Prouse*, 440 U.S. 648, 653, 99 S.Ct. 1391, 1395, 59 L.Ed.2d 660 (1979). Warrantless automobile stops and detentions to check the driver's license and registration are permissible, however, when they are based on an "articulable and reasonable suspicion that ... either the vehicle or an occupant" has violated the law. *Id.* at 663, 99 S.Ct. at 1401. We have noted specifically in the context of automobile stops that objective factors known to the seizing officer must support this suspicion. *United States v. Hawkins*, 811 F.2d 210, 213–215 (3d Cir.), *cert. denied*, 484 U.S. 833, 108 S.Ct. 110, 98 L.Ed.2d 69 (1987).

Velasquez testified during her competency hearing that she did not think that she was speeding at the time she was stopped, and that the car's cruise control mechanism was activated and set at fifty-five miles per hour. App. at 155–56. However, neither Velasquez nor any other defense witness testified at the suppression hearing to controvert Durnan's testimony that she was speeding. Nor did her counsel argue during the hearing that she was not speeding. *See* app. at 438–42. Accordingly, the district court did not consider whether Velasquez was speeding when he ruled that the cocaine was admissible into evidence; rather, he assumed that she was speeding.

Therefore, although Velasquez appears to argue on appeal that she was not speeding, *see* Appellant's Reply Brief, at 3, she waived this issue by not arguing it below. Because this is an issue of fact which was not decided below, we do not reach it.[3]

### 2. *The search*

The district court denied Velasquez's motion to suppress the physical evidence—the cocaine—obtained from the search. The court based its decision on its rulings that Velasquez lacked standing to object to the search and that she voluntarily gave her consent to the search. *See* app. at 448. As the court noted, either ruling by itself would be sufficient to support denial of the motion to suppress. *See* app. at 329–30.

■ We consider first the issue of Velasquez's consent. A voluntarily given consent is an exception to the search warrant requirement and is therefore constitutionally permissible. *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). The government has the burden of proving by a preponderance of the evidence that the search was made pursuant to a voluntary consent. *United States v. Matlock*, 415 U.S. 164, 177, 94 S.Ct. 988, 996, 39 L.Ed.2d 242 (1974); *Bumper v. North Carolina*, 391 U.S. 543, 548, 88 S.Ct. 1788, 1791, 20 L.Ed.2d 797 (1968).

The Supreme Court has instructed that a determination of whether a consent was voluntary must be based on the totality of the circumstances. *See Schneckloth*, 412 U.S. at 227, 93 S.Ct. at 2047. Borrowing from its previous analysis of the voluntariness of a defendant's confession, the Court

3. Nonetheless, we note that the facts indicate that the stop was justified and a finding by the district court to that effect would not have been clearly erroneous. *See McFadden v. United States*, 814 F.2d 144, 147 (3d Cir.1987); *United States v. Doffin*, 791 F.2d 118, 120 (8th Cir.), *cert. denied*, 479 U.S. 861, 107 S.Ct. 210, 93 L.Ed.2d 140 (1986).

   The stop was based on Delaware State Police Officer Durnan's reasonable and articulable suspicion that Velasquez had broken the law by speeding. This suspicion was supported by the objective factors described in Durnan's testimony. He observed the Ford LTD driven by Velasquez speeding. He based this conclusion on his pacing the Ford's speed with his own speedometer. He drove at a constant distance behind the Ford for two to three tenths of a mile, and at that time the speedometer in his vehicle registered 62 miles per hour, in a fifty-five mile-per-hour zone. App. at 332. He also testified that, consistent with department policy, he calibrated his speedometer twice monthly, and he had properly done so before and after the traffic stop. App. at 333–34. Durnan's testimony as to Velasquez speeding was uncontradicted.

explained the totality of the circumstances analysis for evaluating a consent to search:

> Some of the factors taken into account have included the youth of the accused, his lack of education, or his low intelligence, the lack of any advice to the accused of his constitutional rights, the length of detention, the repeated and prolonged nature of the questioning, and the use of physical punishment such as the deprivation of food or sleep. In all of these cases, the Court determined the factual circumstances surrounding the confession, assessed the psychological impact on the accused, and evaluated the legal significance of how the accused reacted.

*Id.* at 226, 93 S.Ct. at 2047 (citations omitted).

Officer Durnan testified that when he asked Velasquez if she would consent, she replied, "Yes, you can search." App. at 340. Their conversation was in English, and he encountered no language problems. App. at 338–39. Because he detected a Spanish accent, Durnan also provided her with a Spanish language consent to search form, and he explained the substance of the form and asked her to read it. Velasquez held the form for enough time to be able to read it, appeared to read it, and signed it. App. at 341–42, 949.

The consent took place on the shoulder of a major highway during daylight hours. App. at 331. Although the setting for Velasquez's consent was Durnan's patrol car, we perceive no coercion or overreaching in this. Durnan's statement that he asked her to enter the car because it was warmer and quieter than outside is reasonable and uncontroverted. Velasquez's companion Terselich was clearly visible from where she sat. App. at 345. Velasquez was not subjected to threats, promises or inducements, nor was she under the influence of alcohol or drugs. App. at 345.

Velasquez asserts on appeal that the district court erred in finding that she had not been arrested at this point, *see* appellant's brief at 23. However, she was under reasonable investigative detention, and this does not constitute an arrest. Although Velasquez' movement was curtailed, a traffic stop does not constitute the degree of custody associated with formal arrest in terms of its impact on consent. *See Berkemer v. McCarty*, 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984).

Velasquez's age, education and apparent intelligence also support a finding of voluntariness. She is forty-three years old and college-educated. She has worked as a journalist. She has lived in the United States for at least the last fifteen years and has worked in Miami, Florida as a cosmetologist. The district court found that she can speak and understand English. App. at 470, 474. Although she was not told that she could refuse to consent, the Supreme Court stated in *Schneckloth* that "the prosecution is not required to demonstrate such knowledge as a prerequisite to establishing a voluntary consent." 412 U.S. at 249, 93 S.Ct. at 2059. The individual's knowledge of her right to refuse consent is only one factor in the totality of the circumstances inquiry. All the other factors here indicate that the consent was voluntary.[4]

Given the circumstances of this case, we determine that Velasquez voluntarily consented to allow Durnan to search her car. Therefore, the district court properly denied her motion to suppress the cocaine on

---

**4.** We recognize that Velasquez was diagnosed as suffering from an "adjustment disorder", both by psychiatrists for the defense and for the prosecution. *See* app. at 55, 182. The district judge, ruling on Velasquez' motion to suppress the cocaine, rejected the defense psychiatrist's conclusion that the stress of the detention completely vitiated the validity of her consent. The judge stated: "There is no evidence here that at that moment she did not know what she was doing or that she suffered such a mental trauma at that very second when she is asked for a consent that she couldn't consent, didn't know what she was doing." App. at 443.

Even if her adjustment disorder was triggered by the *detention*, prior to the arrest after the search, we agree that her mental or emotional state was not such that she acted involuntarily or without awareness of what she was doing. This conclusion is supported by our discussion below regarding Velasquez' competence to stand trial.

this basis.[5]

B.

Velasquez next argues that both the evidence discovered during the search of her car, and the incriminating statements she made to Agent Glanz, must be suppressed because she was unconstitutionally taken into police custody pursuant to Del. Code Ann. tit. 11, § 1902 (1985) (the Delaware "detention statute"). She contends that this statute is unconstitutional, because it authorizes a police officer to take a person into custody when the officer does not have probable cause to believe that person has committed a crime. She argues that since she was taken into custody pursuant to this statute, her "detention" was illegal and unconstitutional, and the evidence discovered as a result of this "detention" must be suppressed.

The United States argues that at the time Durnan placed Velasquez under "two-hour detention," he had probable cause to place her under arrest. In this regard, we note that even if the Delaware statute could not be sustained, this determination would not foreclose the United States from justifying Velasquez's custody by proving probable cause. *See Florida v. Royer*, 460 U.S. 491, 507, 103 S.Ct. 1319, 1329, 75 L.Ed.2d 229 (1983) (plurality opinion) ("fact that officers did not believe there was probable cause and proceeded on a consensual or *Terry* stop rationale would not foreclose the State from justifying Royer's custody by proving probable cause"); *United States v. Hawkins*, 811 F.2d 210, 214–15 (3d Cir.1987) (question of reasonableness of stop, like that of legality of arrest, depends on objective factors, and fact that pretextual reason was given for stop will not invalidate stop which was objectively reasonable); *United States v. Belle*, 593 F.2d 487, 496–97 (3d Cir.) (reviewing record to determine whether probable cause existed for arrest, even though detention was not originally characterized as an "arrest"), *cert. denied*, 442 U.S. 911, 99 S.Ct. 2825, 61 L.Ed.2d 277 (1979). Because we conclude that Durnan had, at the time, information which would have given him probable cause to arrest Velasquez, we need not address the issue of the constitutionality of the Delaware statute which permits detention based on less than probable cause.

The record here reveals that at the moment Durnan placed Velasquez under "two-hour detention," he was aware of the following information: (1) that Velasquez and her companion had given him conflicting stories about the purpose of their trip and their relationship; (2) that she and her companion appeared nervous when answering his questions; (3) that Velasquez had told him the automobile she was driving belonged to her "cousin," but could not give his name; (4) that Velasquez and her companion were on a long-distance trip from Miami, a major drug importation point, to the New York area; and (5) that the automobile she was driving had a false floor in its trunk and appeared to be specially modified to carry contraband in a secret compartment.

Given these facts, we find that Durnan had a reasonable basis at that moment to believe that Velasquez and her companion were engaged in the interstate smuggling of contraband, most likely illegal drugs. We find that he had probable cause at that moment to arrest Velasquez. Accordingly, we conclude that Durnan's seizure of Velasquez did not violate the fourth amendment. We, therefore, will not require that the evidence obtained as a result of her detention be suppressed, without consideration of the constitutionality of the Delaware statute.

C.

We next discuss Velasquez' claim that the district court erred in denying her mo-

---

5. As noted above, the district court denied the motion to suppress the cocaine because it determined that Velasquez lacked standing to object to the search, as well as because she consented to the search. Even if Velasquez possessed a legitimate expectation of privacy in the Ford so as to establish standing to challenge the introduction of the cocaine into evidence, her valid consent nonetheless precludes the suppression of the evidence. Therefore, we need not reach the issue of whether she had standing to suppress the cocaine found in the car.

tion to suppress the statements she made to Agent Glanz while in custody. Velasquez argues that she did not waive the *Miranda* rights which she had previously invoked and that the statements should not have been admitted.[6]

In its landmark decision in *Miranda v. Arizona,* the Supreme Court imposed certain obligations on police in custodial interrogations, in order to dissipate the "compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." 384 U.S. 436, 467, 86 S.Ct. 1602, 1624, 16 L.Ed.2d 694 (1966). Prior to questioning, the police must inform the suspect of his right to remain silent and his right to have counsel present during interrogation, as well as their intent to use his statements to secure a conviction. *See id.* at 468-70, 86 S.Ct. at 1624-26. They also must cease the interrogation if at any point the suspect indicates that he wishes to remain silent or that he wants an attorney. *See id.* at 473-74, 86 S.Ct. at 1627-28.

*Miranda* allows the suspect to waive these rights, "provided the waiver is made voluntarily, knowingly and intelligently." *Id.* at 444, 86 S.Ct. at 1612. The inquiry has two components. First, the waiver must have been voluntary "in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception." *Moran v. Burbine,* 475 U.S. 412, 421, 106 S.Ct. 1135, 1141, 89 L.Ed.2d 410 (1986) (citing *Fare v. Michael C.,* 442 U.S. 707, 725, 99 S.Ct. 2560, 2572, 61 L.Ed.2d 197 (1979)). Second, the waiver "must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.*

In *Edwards v. Arizona,* the Supreme Court held that an accused person in custo-dy who has invoked his desire not to speak until he has conferred with counsel "is not subject to further interrogation ... until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." 451 U.S. 477, 484-85, 101 S.Ct. 1880, 1885, 68 L.Ed.2d 378 (1981). The Court in *Edwards* provided that two factors must be present before a suspect in custody may be subjected to further interrogation after he has requested an attorney, *see id.* at 485, 486 n. 9, 101 S.Ct. at 1885 n. 9, and the Court later articulated these factors as a two-part test in *Oregon v. Bradshaw,* 462 U.S. 1039, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983). First, the suspect must initiate the conversation with the authorities, not vice versa. Second, after the suspect initiates the conversation, the waiver of the right to counsel and the right to silence must be knowing and voluntary. *Id.* at 1045-46, 103 S.Ct. at 2834-35.

1. *The initiation requirement*

■ Eight Justices in *Bradshaw* agreed that a two-step process applies in determining whether the suspect waived his rights, but they disagreed over what constitutes an "initiation" by the suspect. The four-Justice plurality stated that questions which "evinced a willingness and a desire for a generalized discussion about the investigation" would suffice. 462 U.S. 1039, 1046, 103 S.Ct. 2830, 2835. The four dissenters accepted the two-step analysis but required a more stringent test for establishing an initiation, defining "initiation" as "communication or dialogue *about the subject matter of the criminal investigation.*" *Id.* at 1053, 103 S.Ct. at 2839 (Marshall, J., dissenting) (emphasis in original). Justice Powell, providing the swing vote,

**6.** Velasquez also argues on appeal that her incriminating statements themselves were involuntary—a related but distinct issue from the voluntariness of her waiver of her *Miranda* rights. *See* Reply Brief of Appellant, at 5. However, the issue of the voluntariness of her statements does not appear to have been raised and decided below. Velasquez' motion to suppress the statement addresses the waiver issue, but the motion is ambiguous, at best, as to the issue of the voluntariness of the statement. *See* app. at 295-96. Moreover, her memorandum in support of that motion clearly addresses only the waiver issue. App. at 449-52. Consequently, the district court determined that she had made a valid waiver of her right to counsel and right to silence, but did not address the voluntariness of her confession. Therefore, we consider only the waiver issue on appeal, and we do not reach the confession issue.

rejected the two-step approach but considered the confession admissible because the defendant had knowingly and intelligently waived his rights. *Id.* at 1051, 103 S.Ct. at 2833 (Powell, J., concurring).

The Supreme Court has not addressed this specific issue since the *Bradshaw* case, nor have any lower courts provided guidance on this issue. Thus, uncertainty persists as to what constitutes an initiation. Although we are not bound by the *Bradshaw* plurality opinion on this issue and are free to apply either the plurality's or the dissent's test, we choose to adopt the plurality view that an initiation occurs when a suspect initiates a conversation "evinc[ing] a willingness and a desire for a generalized discussion about the investigation." 462 U.S. at 1046, 103 S.Ct. at 2835. We think that such a conversation is a reasonable middle ground between a routine statement purely incidental to the custodial relationship—for example, a request to use the bathroom—which cannot fairly be said to fulfill the first part of the *Bradshaw* plurality's test, and a more detailed statement about the subject matter of the investigation. The latter statement, while clearly satisfying the first part of the test, may set an unduly high standard. Such a standard might convert the prophylactic value of the initiation requirement, announced in *Edwards* and further developed in *Bradshaw,* into an overly stringent substantive hurdle.

The Supreme Court in *Bradshaw* characterized the initiation requirement not as a constitutional right itself, or a component thereof, but as "in effect a prophylactic rule, designed to protect an accused in police custody from being badgered by police officers in the manner in which the defendant in *Edwards* was." *Id.* at 1044, 103 S.Ct. at 2834. We think that the substantive aspects of a suspect's statement are better considered in the second prong of the two-prong *Bradshaw* test, i.e., whether a voluntary and intelligent waiver has occurred considering the totality of the circumstances. Thus, until further guidance by the Supreme Court, we will apply the plurality's definition of "initiation" in this context.

The *Bradshaw* plurality also noted that an "initiation" must be evidenced by more than "merely a necessary inquiry arising out of the incidents of the custodial relationship." 462 U.S. at 1046, 103 S.Ct. at 2835. The plurality explained: "There are some inquiries, such as a request for a drink of water or a request to use a telephone, that are so routine that they cannot be fairly said to represent a desire on the part of an accused to open up a more generalized discussion relating directly or indirectly to the investigation." *Id.* at 1045, 103 S.Ct. at 2835. The *Bradshaw* dissenters, naturally, did not disagree with this principle.

### 2. *The initiation by Velasquez*

After discovering the cocaine, Officer Durnan read Velasquez her *Miranda* warnings, and shortly thereafter Durnan brought in Agent Glanz and introduced Velasquez to him. Glanz showed her his credentials and explained that he wished to speak with her. She indicated that she did not wish to be questioned and would like to consult an attorney, and the interview was terminated. One half hour later Velasquez asked Durnan to get the investigator, Glanz, because she wanted to speak to him. When Velasquez was brought back to the interrogation room with Glanz, the ensuing conversation between them led to Velasquez's incriminating statements.

Velasquez first asked Glanz, "What is going to happen?". We think that this question, taken on these facts, reflected Velasquez's willingness to engage in "a generalized discussion about the investigation." *Bradshaw,* 462 U.S. at 1046, 103 S.Ct. at 2835. By asking the question, Velasquez initiated the conversation. While the question itself may not be free of all ambiguity, its context supports the conclusion that it was directed toward the investigation. This is so because Velasquez specifically requested to speak with the federal investigator, rather than to the state police officer who was about to bring her before a magistrate. We think that Velasquez desired to discuss the investigation, and that the question was not merely a routine inquiry incidental to her custodial

relationship. Indeed, the question which Velasquez asked Glanz is almost identical to the question asked by the suspect in *Bradshaw* and which the Supreme Court held evinced a general desire to discuss the case. Therefore, the first prong of the *Bradshaw* test has been satisfied.[7]

### 3. *The waiver requirement*

■ The Supreme Court in *Miranda* stated that a suspect informed of his right to counsel and right to remain silent may waive those rights if the waiver is "made voluntarily, knowingly and intelligently." 384 U.S. at 444, 86 S.Ct. at 1612. We must make this determination considering "the totality of the circumstances." *Bradshaw*, 462 U.S. at 1046, 103 S.Ct. at 2835 (quoting *Edwards v. Arizona*, 451 U.S. at 486 n. 9, 101 S.Ct. at 1886 n. 9). In analyzing the totality of the circumstances, we must look at the facts of the particular case, including the background, experience, and conduct of the suspect. *See Bradshaw*, 462 U.S. at 1046, 103 S.Ct. at 2835.

7. In *Bradshaw*, the suspect, Bradshaw, was taken into custody and advised of his rights as required by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Bradshaw discussed his involvement with the deceased, but denied involvement in the traffic accident that killed the deceased. During this conversation, an officer stated that he suspected that Bradshaw had caused the death. At this point, Bradshaw requested an attorney. The officer immediately terminated the conversation. Later, while still in custody, Bradshaw asked a police officer, "Well, what is going to happen to me now?" 462 U.S. at 1042, 103 S.Ct. at 2833. The officer again provided *Miranda* warnings, and then stated the charges which Bradshaw faced and where he would be taken. The officer suggested Bradshaw take a lie detector test, to which Bradshaw agreed. The next day, after signing a written waiver of his *Miranda* rights, the polygraph was administered, and the examiner told Bradshaw that he did not believe he was telling the truth. Bradshaw then recanted his earlier story and admitted to having been at the wheel of the vehicle in which his companion had died. *Id.*

8. As we noted in *Miller v. Fenton*, 796 F.2d 598, 601 (3d Cir.), *cert. denied*, 479 U.S. 989, 107 S.Ct. 585, 93 L.Ed.2d 587 (1986), we review this issue with no deference to the district court's determination. In *Miller*, we reviewed the procedural history of that case, describing how the Supreme Court had reversed and remanded our earlier decision in which we had indicated that "federal review of the state court's finding of

In addition, the government has the burden of proving the waiver by a preponderance of the evidence. *Colorado v. Connelly*, 479 U.S. 157, 168–69, 107 S.Ct. 515, 522–23, 93 L.Ed.2d 473 (1986). Whether a confession made by a suspect in custody was voluntary is a purely legal issue for our plenary review, *see Miller v. Fenton*, 796 F.2d 598, 601 (3d Cir.), *cert. denied*, 479 U.S. 989, 107 S.Ct. 585, 93 L.Ed.2d 587 (1986), and whether a waiver was voluntary, knowing and intelligent is likewise subject to plenary review.[8]

### 4. *The waiver by Velasquez*

Before commencing a totality of the circumstances analysis of Velasquez's waiver, we address a preliminary issue. The district court determined that Velasquez had waived her *Miranda* rights when she asked her second question, "What is going to happen to Ivan?" The court expressly declined to consider the effect of Glanz's deceptions on Velasquez's state of mind.[9]

voluntariness [of a suspect's confession] was deferential, limited to determining whether the state court had applied the proper legal test and whether the conclusion reached by the state court was supported by the record as a whole." *Id.* (footnote omitted). We described the Supreme Court's review of our decision, and our determination on remand:

> Stating that the issue of voluntariness is a legal, rather than a factual, question, the Court held that whether the challenged confession was voluntary is a matter for independent federal appellate determination. It remanded the case so that we might conduct a fuller analysis under the correct standard. We now engage in such an inquiry and conclude that Miller's confession was elicited in a manner compatible with the requirements of the Constitution.

*Id.* at 601. We recognize that *Miller* dealt with the issue of voluntariness of a confession, whereas the instant issue involves the voluntariness of a waiver of *Miranda* rights. Nonetheless, the standard of review is plenary in both cases.

9. In determining that Velasquez had waived her *Miranda* warnings, the district court stated in its ruling:

> When Miss Velasquez asked her second question (What is going to happen to Ivan?) she must be considered as having made a voluntary and intelligent waiver before the lies were told to her by Glanz. Under the totality

We think that the district court misapplied *Bradshaw* in determining that the waiver occurred immediately when Velasquez asked her first question.

As the Supreme Court pointed out in *Bradshaw*, the initiation of a conversation by defendant does not by itself constitute a waiver of previously invoked *Miranda* rights. *See Bradshaw*, 462 U.S. at 1044, 103 S.Ct. at 2834. Rather, the Court held only that when the accused initiates a conversation—and, as discussed above, the conversation must evince a desire to discuss the case generally—then *further interrogation* of the accused may take place. *See, id.; see also Wyrick v. Fields*, 459 U.S. 42, 46, 103 S.Ct. 394, 395, 74 L.Ed.2d 214 (1982) (per curiam). After the first *Bradshaw* prong, initiation, has been satisfied, interrogation is permitted. Satisfaction of the second prong, voluntary, knowing and intelligent waiver, is then possible, depending on the totality of the circumstances.

By asking her first question ("What is going to happen?"), Velasquez initiated the conversation and evinced a desire for a generalized discussion about the investigation. The waiver did not occur, however, until after she had asked her second question regarding what would happen to Terselich. In response to that question, Glanz provided her with misinformation about Terselich. Immediately thereafter, she made the incriminating statements which are the focus of the present dispute, and, as discussed below, by doing so she waived her right to counsel and right to silence. Thus, the waiver occurred *after* the misinformation was given to Velasquez, and our assessment of the validity of the waiver must include examination of the effect of the misinformation.[10]

■ We now address whether the waiver was "knowing and intelligent" under the totality of the circumstances. An examina-

tion of Velasquez's background reveals that she is a mature adult, forty-three years of age. She was born in Colombia, South America, where she graduated from college and worked as a journalist. She is able to speak and understand English. She has lived in the United States for at least fifteen years, and has worked in Miami as a cosmetologist.

Velasquez evidently understood the import of the *Miranda* warnings given by Durnan, because she invoked her right to counsel one half-hour before she made her incriminating statements. Although a psychiatrist testified at the competency hearing that she had suffered psychological trauma arising from the arrest, sufficient evidence was presented to demonstrate that she understood the legal proceedings concerning her, and the functions of the judge, jury, and counsel. We conclude that Velasquez possessed "a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine*, 475 U.S. at 421, 106 S.Ct. at 1141. Thus, her waiver was knowing and intelligent.

■ We next turn to the more difficult issue of voluntariness. With regard to the nature of her confinement and interrogation, the district court found that Velasquez had been in custody for less than two hours at the time she made her statements, and that no threats or promises were made. App. at 474. Nor was she ill-treated. After the cocaine was found, she was given her *Miranda* warnings. The failure of Glanz to provide her with new *Miranda* warnings impacts only slightly on the validity of her waiver, because only a short time had passed between her receiving the *Miranda* warnings and her requesting to speak with Glanz.

Aside from her psychological problems, the only factor supporting a finding that

---

of the circumstances I find the second prong of Bradshaw satisfied. Defendant therefore waived her *Miranda* rights.
App. at 475.

10. The district court recognized that its analysis on this point might be flawed. Because it perceived the waiver issue to be a close question,

the district court encouraged Velasquez to appeal if convicted. App. at 475-76. The court also noted candidly that "a reviewing court could differ from my conclusion that the waiver occurred prior to Glanz replying to defendant Velasquez in a false manner." App. at 476.

her waiver was not voluntary was Glanz's false statement to Velasquez about Terselich making a statement against her and being set free. The Supreme Court has stated that a waiver must have been voluntary "in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception." *Moran v. Burbine*, 475 U.S. at 421, 106 S.Ct. at 1141. The Court has also advised, however, that lies told by the police do not necessarily make a confession involuntary; rather, this is simply one factor to consider out of the totality of the circumstances. *Frazier v. Cupp*, 394 U.S. 731, 739, 89 S.Ct. 1420, 1425, 22 L.Ed.2d 684 (1969). We have stated that "[w]hile a lie told to the detainee about an important aspect of the case may affect the voluntariness of the confession, the effect of the lie must be analyzed in the context of all the circumstances of the interrogation." *Miller*, 796 F.2d at 607.

In the *Frazier* case, Frazier was arrested in connection with a murder and was questioned by police. He admitted being with his cousin Rawls on the night in question, but he denied being with any third person. In the midst of questioning he was given his *Miranda* warnings, after which questioning became more vigorous. The officer questioning Frazier then told him, falsely, that Rawls had been brought in and had confessed. Shortly thereafter, Frazier began to confess and eventually he signed a written confession. 394 U.S. at 737–38, 89 S.Ct. at 1423–24.

The Supreme Court rejected Frazier's claim that his confession was involuntary and should have been excluded from evidence. 394 U.S. at 739, 89 S.Ct. at 1425. As the Court noted, the fact that a suspect was given warnings of his constitutional rights prior to making the incriminating statement is "quite relevant to a finding of voluntariness." *Id.; see also Davis v. North Carolina*, 384 U.S. 737, 740–41, 86 S.Ct. 1761, 1763–64, 16 L.Ed.2d 895 (1966). The Court looked at the age, intelligence, maturity and length of detention of Frazier, and concluded that "[t]he fact that the police misrepresented the statements that Rawls had made is, while relevant, insuffi-

cient in our view to make this otherwise voluntary confession inadmissible." 394 U.S. at 739, 89 S.Ct. at 1425.

In *Miller v. Fenton*, 796 F.2d 598 (3d Cir.), *cert. denied*, 479 U.S. 989, 107 S.Ct. 585, 93 L.Ed.2d 587 (1986), another case involving the voluntariness of a confession, the murder suspect, Miller, was given his *Miranda* warnings and was then interrogated. The interrogating police officer employed an approach which involved befriending and sympathizing with Miller. In addition, at the beginning of the interrogation, the officer informed Miller that the victim was still alive, which was false. During the interrogation, the officer told Miller that she had just died, when in fact she had been found dead several hours earlier. 796 F.2d at 602.

We concluded in *Miller* that the lie about the timing of the victim's death, by itself, did not constitute sufficient deception to overcome Miller's will. We stated that "[b]ecause [the officer] never suggested that the time of [the victim's] death might be relevant in linking Miller to the crime, the only possible effect of [his] initial statement that she was alive, followed by his report that she had just died, would be an emotional response in Miller." *Id.* at 607. This response, we held, did not occur.

We recognize that both *Frazier* and *Miller* dealt with the issue of voluntariness of a confession, whereas the instant issue involves the voluntariness of a waiver of *Miranda* rights. However, there is a paucity of case law to guide us in the area of deception in the *Miranda* waiver context. Moreover, these cases are helpful to our analysis of the waiver issue, because the analytical framework applied in the confession context—the totality of the circumstances—is also the proper approach to the waiver issue. *See Oregon v. Bradshaw*, 462 U.S. at 1046, 103 S.Ct. at 2835.

The instant case presents a deception which seems to fall closer to the facts of *Frazier* than those of *Miller*. As in *Frazier*, the false information here went directly to the suspect's connection to the crime. In *Frazier*, the false statement was that

Frazier's cousin had confessed. This, in connection with Frazier's previous admission that he had been with his cousin on the night of the murder, was designed to make the suspect think that the evidence against him was stronger than it actually was. Likewise, in the instant case Velasquez was told that Terselich had stated that the drugs were hers and that she had been paid $5,000 to drive the drugs north from Miami. This falsehood, like that in *Frazier*, had the effect of greatly inflating the state's evidence of the suspect's guilt.

Finally, Velasquez specifically asked to speak with Agent Glanz, thus indicating that it was likely that she wanted to discuss the investigation and less likely that the statement was a spontaneous reaction to Glanz's falsehood. Moreover, the false statement was given to Velasquez in response to her own specific question about her co-suspect. It was not volunteered by the interrogating officer.

Although the deception may have been a partial cause of Velasquez's statements, we do not think that her will was overcome or her capacity for self-control vitiated.[11] Moreover, as in *Frazier*, all the other factors point towards voluntariness. Considering the totality of the circumstances, we think that Velasquez voluntarily waived her right to counsel and her right to remain silent. Thus, we affirm the district court's decision to deny her motion to suppress her statements.

### D.

■■■ Velasquez raises an additional issue which we briefly address. She contends that the district court erred in determining that she was competent to stand trial. The statute governing a defendant's competency to stand trial states in relevant part:

> If, after the hearing, the Court finds by a preponderance of the evidence that the defendant is presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense, the Court shall commit the defendant to the custody of the Attorney General.

18 U.S.C. § 4241(d). At the competency hearing, the Government has the burden to prove the defendant's competency. *United States v. DiGilio*, 538 F.2d 972, 988 (3d Cir.1976), *cert. denied*, 429 U.S. 1038, 97 S.Ct. 733, 50 L.Ed.2d 749 (1977). The district court's finding of competency is a factual finding which we review under the clearly erroneous standard. *McFadden v. United States*, 814 F.2d 144, 146 (3d Cir. 1987); *see also Maggio v. Fulford*, 462 U.S. 111, 103 S.Ct. 2261, 76 L.Ed.2d 794 (1983).

■■■ At the competency hearing, the defense asserted not that Velasquez did not understand the nature and consequences of the criminal action against her, but that Velasquez was not competent because she was unable to cooperate and assist her attorney in a rational manner. *See* app. at 275. The psychiatrists for both the defense and the prosecution agreed that Velasquez suffered from an adjustment disorder with mixed emotional features, namely, depression and, according to the defense psychiatrist, anxiety. The psychiatrists disagreed on whether Velasquez was competent to stand trial. The district court found that Velasquez was merely exercising poor judgment in not disclosing certain information to her counsel, but that, how-

---

**11.** We stated in *Miller:* "We emphasize that the test for voluntariness is not a but-for test: we do not ask whether the confession would have been made in the absence of the interrogation. Few criminals feel impelled to confess to the police purely of their own accord, without any questioning at all. Thus, it can almost always be said that the interrogation caused the confession." 796 F.2d at 604–05 (citations omitted).
We also noted: "[Manipulation and lies] may play a part in the suspect's decision to confess, but so long as that decision is a product of the suspect's own balancing of competing considerations, the confession is voluntary. The question we must answer, then, is not whether Detective Boyce's statements were the cause of Miller's confession—indeed, we assume that to be the case—but whether those statements were so manipulative or coercive that they deprived Miller of his ability to make an unconstrained, autonomous decision to confess." *Id.* at 605.

ever irrational her decisions not to disclose information were, she was not incapable of assisting counsel by reason of mental defect. *See* app. at 276–78. Under the circumstances, we cannot say that the district court's determination that Velasquez was competent is clearly erroneous.[12]

### III.

Velasquez also argues that the evidence was insufficient as a matter of law to support her convictions for possession and conspiracy to possess. She contends that both the cocaine and the statements to Agent Glanz should be suppressed, and that if either item were suppressed the evidence would be insufficient to sustain a conviction. *See* Appellant's Brief, at 29–31. We need not decide this issue as she has framed it, of course, because we have already held that both the cocaine and the statements were properly admitted.

We find the evidence sufficient to support a conviction for possession. The evidence to support conviction is sufficient if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original). Moreover, Velasquez "bears a 'very heavy burden,' since [the evidence] must [be] view[ed] in the light most favorable to the government and ... all permissible inferences [construed] in its favor." *United States v. Gotay*, 844 F.2d 971, 978 (2d Cir.1988). Velasquez ignores that the jury is allowed to draw a reasonable inference, from her statements and the presence of the cocaine, that she knew about the cocaine. Moreover, actual knowledge of the cocaine—established either by inference or by direct proof—need not have been shown at all, because the jury was also instructed on the theory of "deliberate ignorance". *See* app. at 920–22. Thus, sufficient evidence exists to support a conviction for possession.

The jury's verdict on the *conspiracy* charge is more problematic. The difficulty here arises from our recent disposition of an appeal filed by Velasquez's alleged coconspirator, Ivan Terselich. *United States v. Terselich*, 885 F.2d 1094 (3d Cir.1989). Velasquez was indicted for conspiring with Terselich and other unknown and unnamed individuals, *see* app. at 11, while Terselich was indicted for conspiring with Velasquez and other unknown and unnamed individuals. After a joint trial, both were found guilty of conspiracy.

In our opinion deciding Terselich's appeal, we concluded that the United States had not presented sufficient evidence to prove that he was guilty of conspiracy, and that the district court had erred, as a matter of law, when it did not grant Terselich's motion for a judgment of acquittal notwithstanding the jury verdict finding him guilty. We therefore reversed his conviction and remanded for entry of a judgment of acquittal.

Since our disposition of Terselich's appeal could not have been anticipated by Velasquez, we think it appropriate to raise, *sua sponte*, the issue of the impact of this disposition on Velasquez's conspiracy conviction. Velasquez does argue that the United States did not present sufficient evidence to support the jury's finding of guilt, *see* discussion *supra*, and an assessment of the impact of our reversal of Terselich's conviction on Velasquez's conviction is, in important respects, related to this argument.

As noted above, we have already concluded that the United States did not present sufficient evidence to demonstrate that Terselich joined the conspiracy alleged in the indictment. Since there was insufficient evidence for the jury to conclude that

---

**12.** In addition, in her opening brief on appeal, filed November 22, 1988, Velasquez argued that the Federal Sentencing Guidelines, under which she was sentenced, are unconstitutional on their face and as applied to her case. Prior to filing that brief, however, Velasquez had filed a motion for severance of issues on appeal, which was referred to a merits panel of this Court. On December 2, 1988, this Court entered a written order granting the motion. Therefore, the sentencing issues are not part of this appeal and we do not consider them.

Terselich joined the conspiracy, we necessarily find that there was also insufficient evidence for the jury to conclude that Velasquez conspired with Terselich. The only issue remaining, as we see it, is whether the jury impermissibly based its conviction of Velasquez on a finding that she conspired with Terselich, or whether the jury permissibly found that Velasquez conspired with unknown and unnamed individuals, as was also charged in the indictment.

There is, of course, no way for us to conclusively determine the basis of the jury's decision. It is significant, however, that the indictment alleged that Velasquez conspired with Terselich, that the government went forward with the case on that primary theory, and that the jury concluded, impermissibly, that Terselich was a member of the conspiracy. Given this record, we find there is a substantial likelihood that the jury's verdict finding Velasquez guilty of conspiracy was based on an impermissible determination that she conspired with Terselich. We will therefore reverse Velasquez's conspiracy conviction. *See Yates v. United States,* 354 U.S. 298, 312, 77 S.Ct. 1064, 1073, 1 L.Ed.2d 1356 (1957) ("A verdict [must] be set aside in cases where the verdict is supportable on one ground, but not on another, and it is impossible to tell which ground the jury selected."); *Cramer v. Fahner,* 683 F.2d 1376, 1379–80 (7th Cir.) ("Where a verdict is supportable on one ground but not another, and it is impossible to tell which grounds the jury selected, the conviction is unconstitutional") (citing *Stromberg v. California,* 283 U.S. 359, 368, 51 S.Ct. 532, 535, 75 L.Ed. 1117 (1931)), *cert. denied,* 459 U.S. 1016, 103 S.Ct. 376, 74 L.Ed.2d 509 (1982). This charge is remanded to the district court, where the United States is free to seek a retrial on the charge on the theory that Velasquez conspired with unknown and unnamed individuals.[13]

13. We emphasize that in reversing Velasquez's conspiracy conviction, we are not applying the common law "rule of consistency," which may require the reversal of certain inconsistent jury verdicts in conspiracy cases. Instead, we are holding that we cannot affirm a conviction which the record before us indicates is probably based on a factual determination—that Terselich conspired with Velasquez—that we found in *Terselich* to be erroneous as a matter of law.

The "rule of consistency" "provides that where all alleged coconspirators save one are acquitted, the conviction of the remaining defendant must be vacated." *Government of the Virgin Islands v. Hoheb,* 777 F.2d 138, 140 (3d Cir. 1985). The rule exists to prevent what would otherwise be logically inconsistent verdicts: a conviction premised on a finding that the defendant conspired with another person; and a jury finding that the government did not present sufficient evidence to prove that any other person was a member of that conspiracy.

While the rule has been applied by numerous federal and state courts, *see id.* at 140 n. 3 (collecting cases), including at least three Supreme Court opinions, this Court has never had occasion to apply the rule or make it part of a holding, and has only discussed the rule in dictum. *Id.* at 140 n. 4. In *Hoheb* we followed the example of a number of recent court decisions which declined to apply the rule where the government alleged, and presented sufficient evidence to prove, that the defendant conspired with unknown persons. *Id.* at 142.

*Hoheb* also raises the possibility that two recent Supreme Court decisions, *Standefer v. United States,* 447 U.S. 10, 100 S.Ct. 1999, 64 L.Ed.2d 689 (1980) and *United States v. Powell,* 469 U.S. 57, 105 S.Ct. 471, 83 L.Ed.2d 461 (1984), have undercut the rule of consistency, and that it "may be a vestige of the past." *Hoheb,* 777 F.2d at 142 n. 6; *see also id.* at 142–43 (Garth, J., concurring) (arguing that rule of consistency is no longer viable).

In *Standefer* the Court, refusing to apply the doctrine of non-mutual collateral estoppel to a jury verdict in a criminal case, held that a person could be convicted of aiding and abetting even though his principal was acquitted in a separate proceeding. 447 U.S. at 22–23, 100 S.Ct. at 2007–08. In *Powell,* the Supreme Court reaffirmed and explained the rule that a jury may reach inconsistent verdicts with respect to a single defendant in a criminal trial. 469 U.S. at 60–69, 105 S.Ct. at 474–79.

Significantly, in both *Standefer* and *Powell* the Supreme Court relied on the fact that in reality, inconsistent jury verdicts are often a product of jury lenity. Thus, the Court recognized that the jury has an "historic function, in criminal trials, as a check against arbitrary or oppressive exercises of power by the Executive Branch." *Powell,* 469 U.S. at 65, 105 S.Ct. at 477. An acquittal on one count, the Court therefore reasoned, does not necessarily indicate that the jury did not find there to be sufficient evidence of guilt on that charge. Thus, the acquittal should not mandate reversal of a finding of guilt on another charge which is dependent on the same factual allegations.

The *Powell* Court also emphasized:
Finally, we note that a criminal defendant already is afforded protection against jury irrationality or error by the independent review

## IV.

For the reasons discussed above, we affirm Velasquez's conviction for possession with intent to distribute of more than five kilograms of cocaine. We will reverse her conviction for conspiracy, and remand for further disposition in accordance with this Opinion.

STAPLETON, Circuit Judge,
concurring and dissenting:

I join the court's opinion with one exception. Although I agree with the court's discussion of *Oregon v. Bradshaw,* 462 U.S. 1039, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983), I remain unpersuaded by its conclusion that the Supreme Court's and this court's decisions in *Miller v. Fenton,* 474 U.S. 104, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985), *on remand,* 796 F.2d 598 (3d Cir.), *cert. denied,* 479 U.S. 989, 107 S.Ct. 585, 93 L.Ed.2d 587 (1986), mandate the conclusion that a remand is unwarranted here because voluntariness is entirely a "legal" issue and as such subject to plenary review. Although I assume that a trial court's determination on the issue of the voluntariness of a waiver of a constitutional right is subject to plenary review, I conclude that we should remand to the district court so that a decision on the voluntariness of Ms. Velasquez's waiver can be made in the first instance by one who has had direct exposure to the relevant evidence.

Because Chief Judge Schwartz found that Velasquez had knowingly, intelligently, and voluntarily waived her rights to counsel and to remain silent about the subject matter of the investigation before Agent Glanz lied to her, he did not consider the effect those lies had on the voluntari-

ness of that waiver. Indeed, his opinion expressly declines to express a view on that issue. The court holds, and I agree, that *Bradshaw*'s second prong could not be fulfilled on this record at any point before Agent Glanz lied to Velasquez. Having concluded that the district court did not apply *Bradshaw* correctly to the issue of the voluntariness of Ms. Velasquez's waiver, the court nonetheless decides that remand on the issue of voluntariness is unnecessary because *Miller v. Fenton,* 474 U.S. 104, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985), *on remand,* 796 F.2d 598 (3d Cir.), *cert. denied,* 479 U.S. 989, 107 S.Ct. 585, 93 L.Ed.2d 587 (1986) determined that that issue is one of law, subject to plenary review, and that a district court resolution of that issue would be entitled to "no deference." Typescript at 24 n. 8. I disagree and would remand to the district court so that Chief Judge Schwartz could make a finding on whether Velasquez's waiver was voluntary.

In *Miller,* the Supreme Court held that the voluntariness of a confession was not a "factual" issue the resolution of which by a state court must be "presumed correct" by a federal court in a collateral attack proceeding under 28 U.S.C. § 2254(d). The Court specifically reserved the issue of whether the same is true with respect to the voluntariness of a waiver of constitutional rights. For present purposes, I will assume there is no difference between the two. I will also assume that we should conduct our review in this direct appeal in the same manner as we would were we reviewing a state trial court's determination of a voluntariness issue.

I assume, without deciding, that if Chief Judge Schwartz, after considering the to-

---

of the sufficiency of the evidence undertaken by the trial and appellate courts. This review should not be confused with the problems caused by inconsistent verdicts.
*Id.* at 67, 105 S.Ct. at 478.

Even if *Standefer* and *Powell* have undercut the rationale for the common law "rule of consistency"—an issue on which we express no opinion—the rationale for those cases, and for discarding the rule of consistency, is not applicable here. In this case we have what we can only construe on the record before us as a jury finding that Velasquez and Terselich were co-

conspirators, followed by a judicial finding that the evidence presented against Terselich was insufficient, as a matter of law, for the jury to have found him guilty of conspiracy. Terselich's judgment of acquittal is not the result of jury lenity, and the United States is free to appeal that acquittal, as it is the result of a legal determination that the evidence against him was insufficient. Thus, the policy reasons that might weigh against permitting a criminal defendant to invoke collateral estoppel to invalidate inconsistent jury verdicts are not present in this case.

tality of the circumstances following Agent Glanz's deceit, had determined that Velasquez's waiver was or was not voluntary, our review of that decision would have been plenary.[1] It does not follow, however, that there is no value in having a trial court resolve the issue in the first instance. Review of a determination of voluntariness is plenary because such a determination *includes* components that an appellate court is as competent as a trial court to address. However, there are other components of such a determination with respect to which the insight of the trial judge should not be forgone.

The *Miller* court observed that "the admissibility of a confession turns as much on whether the techniques for extracting the statements, as applied to *this* suspect, are compatible with a system that presumes innocence and assures that a conviction would not be secured by inquisitorial means as on whether the defendant's will was in fact overborne." 474 U.S. at 116, 106 S.Ct. at 452–53 (emphasis in original). As this statement indicates, the voluntariness inquiry has a "hybrid quality"; one component of that inquiry requires the court to focus on the conduct of the law enforcement officers while another requires that attention be paid to the state of mind of the person confessing. To be voluntary, a confession must meet two criteria: it must not be the product of an unacceptably coercive stratagem on the part of the police and it must be the product of a rational decisionmaking process, i.e., of a mind not "in fact overborne."

The issue of whether a particular interrogation technique is beyond the bounds of tolerable conduct in a civilized society is not one of historic fact. Nevertheless, as the above-quoted statement suggests, even this issue must be addressed with *"this* [particular] suspect" in mind. What may be tolerable in the context of a person of

considerable intellect may not be so in the context of one who the police should know possesses marginal mental capabilities. Thus, even with respect to this component of voluntariness, to the extent the personal characteristics of the suspect are a part of the inquiry, the process loses something when there is no input from a decisionmaker who has personally observed him or her.

The issue of whether a decision to confess or to waive a constitutional right is the product of rational choice or an overborne will has a substantial factual aspect; the state of mind of a particular individual at a particular time is a historic fact. Even this component of voluntariness, however, is not purely factual. Inevitably, engaging in this analysis requires the injection of normative values both in deciding what is meant by a "free and rational will" and what subsidiary factual determinations imply the presence or absence of such a will. *See Culombe v. Connecticut,* 367 U.S. 568 at 604–605, 81 S.Ct. 1860 at 1880–81, 6 L.Ed.2d 1037 (1961) (opinion of Frankfurter, J.); Joseph D. Grano, *Voluntariness, Free Will, and the Law of Confessions,* 65 Va.L.Rev. 859, 880–890 (1979). *See also* Stephen J. Schulhofer, *Confessions and the Court,* 79 Mich.L.Rev. 865, 870 (1981) (voluntariness-due process test is a subtle mixture of factual and legal elements). Nevertheless, I think it apparent that a trial judge who has been personally exposed to the defendant and to all of the other relevant evidence is in a position to be of material assistance in deciding whether a particular individual's state of mind was such that he or she should be held bound by the confession or waiver.

In short, I do not think the remand issue in this case should be answered by characterizing the issue as one of "law," "fact," or "mixed law and fact," or by labeling the appropriate standard of review "plenary." Rather, we should ask whether there is reason to believe the trial judge could be of

---

1. In *Patterson v. Cuyler,* 729 F.2d 925, 931–22 (3d Cir.1984), this court held that, for the purposes of 28 U.S.C. § 2254(d), a state court's finding on the question of the voluntariness of a waiver of *Miranda* rights is "factual" and thus considered presumptively correct. The court's reasoning, however, was based on its conclusion

that Supreme Court precedent had consistently viewed mixed questions of law and fact as "factual" for the purposes of § 2254(d). That conclusion may be undermined by the Supreme Court's holding in *Miller* that the mixed question of the voluntariness of a confession is not treated as a "factual" one under § 2254(d).

material assistance to us in deciding the relevant issues. If the question is thus posed, I believe there can be only one answer.

The record in this case contains expert psychiatric testimony indicating that Velasquez had an abnormal propensity for emotional imbalance and depression. The startling "news" that her lover had turned on her in exchange for his freedom may conceivably have deprived her of the ability to make a rational decision regarding whether she should give self-incriminating statements without a lawyer present. Given Chief Judge Schwartz's personal exposure to Velasquez and other relevant evidence, I, as a reviewing judge, would like to have his views regarding the impact on Velasquez of Agent Glanz's deceit. If he were to determine that her decision was not the product of rational will, I would find this case materially different than it is in the absence of any determination by the trial judge. For me, plenary review in this context means that we are free to reverse if our judgment on voluntariness differs from that of the trial judge; it does not mean that we are foreclosed from giving any deference to any assessment he might make regarding the effect of the deception on Velasquez.[2]

Accordingly, I would remand to the district court for a determination of the voluntariness of Velasquez's waiver of her right to have counsel present and to remain silent.

---

**2.** While holding in *Miller* that its review was plenary, the Court nevertheless indicated that "a federal habeas court should give great weight to the considered conclusions" of the trial court. 474 U.S. at 112, 106 S.Ct. at 450.