**UNITED STATES of America**

v.

**Guido SANCHEZ.**

No. 96–646.

United States District Court,
D. New Jersey.

April 19, 1999.

Faith S. Hochberg, U.S. Atty., Mark J. McCarren, Asst. U.S. Atty., Newark, NJ, for U.S.

Tomas Espinosa, Jersey City, NJ, for Defendant.

## OPINION

ORLOFSKY, District Judge:

This case presents the novel and unsettled question of what legal standard a District Court must apply under 18 U.S.C. § 4244 [1] to determine whether a convicted person is competent to be sentenced. For the reasons set forth below, I hold that the Due Process Clause of the Fifth Amendment requires that a District Court apply the same legal standard in determining whether a convicted person is competent to be sentenced as the standard which is applied in determining whether a defendant is competent to stand trial pursuant to 18 U.S.C. § 4241. Specifically, in determining whether a convicted defendant is competent to be sentenced pursuant to 18 U.S.C. § 4244, a District Court must decide whether the defendant has sufficient ability to consult with his lawyer with a reasonable degree of rational understanding, and has a rational, as well as a factual understanding of the proceedings against him or her.

[1]. Section 4244 provides, in relevant part:

If, after [a] hearing, the court finds by a preponderance of the evidence that the defendant is presently suffering from a mental disease or defect and that he should, in lieu of being sentenced to imprisonment, be committed to a suitable facility for care or treatment, the court shall commit the defendant to the custody of the Attorney General.

The Attorney General shall hospitalize the defendant for care or treatment in a suitable facility. Such a commitment constitutes a provisional sentence of imprisonment to the maximum term authorized by law for the offense for which the defendant was found guilty.

See 18 U.S.C. § 4244(d).

On March 7, 1997, Guido Sanchez pled guilty to one count of dealing in counterfeit United States obligations in violation of 18 U.S.C. § 473. On July 8, 1997, Sanchez moved to withdraw his guilty plea pursuant to Rule 32(e) of the Federal Rules of Criminal Procedure. After taking testimony, this Court denied Sanchez's motion to withdraw his guilty plea on August 26, 1998. *See United States v. Sanchez*, Crim. No. 96–646(SMO), slip op., (D.N.J. Aug. 26, 1998) at 24. Thereafter, Sanchez moved for reconsideration and for certification of an interlocutory appeal. The Court denied both motions. *See United States v. Sanchez*, Crim. No. 96–646(SMO), slip op., (D.N.J. Oct. 23, 1998) at 7, 23. Sentencing was scheduled for November 20, 1998. On November 19, 1998, on the eve of his sentencing, Mr. Espinosa, counsel for Sanchez, informed the Court that Sanchez was suffering from suicidal ideation, and had been committed to the psychiatric unit at Cabrini Medical Center, located in New York City.

On December 10, 1998, pursuant to 18 U.S.C. §§ 4244, 4247, the Court ordered Sanchez to undergo a psychiatric/psychological evaluation. After receiving the report of the Court appointed psychologist, and the reports of Sanchez's treating psychiatrists, the Court conducted a competency hearing on March 12, 1999. Following the hearing, the parties filed supplemental briefs.

For the reasons that follow, I find, by a preponderance of the evidence, that Sanchez is presently suffering from a mental disease or defect and that he should, in lieu of being sentenced to imprisonment, be committed to a suitable facility for care or treatment. Accordingly, the Court shall commit Sanchez to the custody of the Attorney General for hospitalization in a suitable facility for care or treatment. In addition, in accordance with 18 U.S.C. §§ 473, 4244(d), I shall provisionally sentence Sanchez to commitment for a period of ten years, or until such time as the director of the facility in which Sanchez is hospitalized determines that Sanchez is recovered from his mental disease and is competent to be sentenced, *see* 18 U.S.C. § 4244(e), or until such time as this Court grants a motion by Sanchez for an order directing his discharge from hospitalization. *See* 18 U.S.C. § 4247(h).[2]

## I. BACKGROUND

### A. *Factual and Procedural History*

On October 9, 1996, a criminal complaint was filed in this Court charging Defendant, Guido Sanchez ("Sanchez"), with dealing in counterfeit United States obligations in violation of 18 U.S.C. § 473. *See* Complaint (dated Oct. 9, 1996).[3] On October 10, 1996, Sanchez was arrested and later released on bail. On October 21, 1996, a grand jury returned a one count indictment charging Sanchez with a violation of 18 U.S.C. § 473. *See* Indictment

---

**2.** Section 4244(e) provides, in relevant part:
When the director of the facility in which the defendant is hospitalized pursuant to subsection (d) determines that the defendant has recovered from his mental disease or defect to such an extent that he is no longer in need of custody for care or treatment in such a facility, he shall promptly file a certificate to that effect with the clerk of the court that ordered the commitment. *See* 18 U.S.C. § 4244(e). Section 4247(h) provides, in relevant part:
[C]ounsel for the person or his legal guardian may, at any time during such person's hospitalization, file with the court that ordered the commitment a motion for a hearing to determine whether the person should

be discharged from such facility, but no such motion may be filed within one hundred and eighty days of a court determination that the person should continue to be hospitalized.
*See* 18 U.S.C. § 4247(h).

**3.** Section 473 provides:

Whoever buys, sells, exchanges, transfers, receives, or delivers any false, forged, counterfeited, or altered obligation or other security of the United States with the intent that the same be passed, published, or used as true and genuine, shall be fined under this title or imprisoned not more than ten years, or both. 18 U.S.C. § 473.

(dated Oct. 21, 1996). Specifically, Sanchez was indicted for selling or attempting to sell $100,000 in counterfeit $100 Federal Reserve notes to a confidential informant working on behalf of the Government. *See* Presentence Investigation Report ("PSI") ¶ 7. After his arrest and release on bail, Sanchez pled not guilty at an arraignment on November 8, 1996, before the Honorable Joel B. Rosen, United States Magistrate Judge. *See* Transcript (dated November 8, 1996). At the time of the arraignment, Sanchez was represented by Samuel R. DeLuca, Esq. ("DeLuca") of the law firm of DeLuca & Taite. *See United States v. Sanchez*, Crim. No. 96–646(SMO), slip op, at 4–5 (D.N.J. Aug. 26, 1998) (hereinafter "Opinion of Aug. 26, 1998").

On March 7, 1997, Sanchez retracted his plea of not guilty and, after an extended colloquy with the Court, entered a plea of guilty pursuant to a plea agreement with the Government. *See* Plea Agreement (dated Dec. 28, 1996; executed Mar. 6, 1997).

On June 4, 1997, nearly three months after pleading guilty, Tomas Espinosa, Esq., who had been newly retained as counsel for Sanchez, informed the Court by letter that Sanchez would be moving to withdraw his guilty plea. *See* Letter to the Court (dated June 4, 1997). On July 8, 1997, Sanchez, through his new attorney, Mr. Espinosa, formally moved to withdraw the plea of guilty. (*See* Opinion of Aug. 26, 1998). After initial briefing and the filing of several certifications, including one from Sanchez himself, the Court conducted a two-day evidentiary hearing on November 14 and 18, 1997. *See id.*

In support of his motion to withdraw his guilty plea, Sanchez asserted the following

two arguments based on ineffective assistance of counsel: (1) that Sanchez's former counsel, Mr. DeLuca, failed to investigate or advise Sanchez of the potential affirmative defenses of coercion and entrapment; and (2) that Mr. DeLuca inappropriately promised Sanchez that he would receive a short probationary sentence if he pleaded guilty, and a ten year sentence if he did not so plead. *See United States v. Sanchez*, Crim. No. 96–646(SMO), slip op, at 4–5 (D.N.J. Oct. 23, 1998) (hereinafter "Opinion of Oct. 23, 1998"). On August 26, 1998, the Court filed an opinion and order denying Sanchez's motion to withdraw his plea of guilty. *See* Opinion of Aug. 26, 1998, at 24. Specifically, with regard to the defenses of coercion and entrapment, this Court found:

> I find that regardless of whether [former counsel] investigated th[e] affirmative defense[s] [of entrapment and coercion], there is no likelihood that discovery of the "supporting" evidence would have led [former counsel] to change his recommendation regarding the plea of guilty, no likelihood that Sanchez would have gone to trial based on the entrapment [and coercion] theor[ies], and finally, no likelihood that the defense[s] would have succeeded at trial. Th[ese] theor[ies] provide[ ] no "fair and just reason" for withdrawal of the plea.

*See id.* at 14, 17–18.

On September 28, 1998, Sanchez filed a motion for leave to file an interlocutory appeal.[4] *See* Notice of Motion for Leave to File an Interlocutory Appeal (filed Sept. 28.1998). On October 7, 1998, after considering Sanchez's moving papers and the Government's October 6, 1998 letter-brief

---

4. Sanchez's motion also sought a stay of the sentencing, scheduled for November 20, 1998, at 10:30 a.m., pending the outcome of the interlocutory appeal. *See* Defendant's Notice of Motion for Leave to File Interlocutory Appeal (file Sept. 28, 1998). I denied the request for a stay:

> The Court having found that Defendant has failed to provide this Court with any legal

authority upon which to justify a stay of the sentencing, and that Defendant has failed to address this issue in his memorandum of law; ... Defendant's motion for a stay of the sentencing in this case is DENIED.

*See* Amended Order of the Court (filed Oct. 7, 1998).

in opposition, I denied Sanchez's motion for leave to file an interlocutory appeal for the following reason:

The Court having found that a grant of leave to file an interlocutory appeal would be improper at this time, *see United States v. Gottlieb*, 817 F.2d 475, 476 (8th Cir.1987) (stating that the proper time to challenge an order denying a motion to withdraw a plea of guilty is after sentencing when the decision is final); *see also Midland Asphalt Corp. v. United States*, 489 U.S. 794, 798–99, 109 S.Ct. 1494, 103 L.Ed.2d 879 (1989) (stating that, in criminal cases, 28 U.S.C. § 1291 limits the jurisdiction of courts of appeals to final decisions of the district court "after conviction and imposition of sentence"); *Abney v. United States*, 431 U.S. 651, 97 S.Ct. 2034, 52 L.Ed.2d 651 (1977) (noting the primacy of the final judgment rule governing appeals in criminal cases); ... Defendant's motion for leave to file an interlocutory appeal is hereby DENIED[.]

*See* Amended Order of the Court (filed Oct. 7, 1998).

On October 13, 1998, Sanchez filed a notice of motion for reargument of the Court's October 7, 1998, order denying his motion for leave to file an interlocutory appeal from the Court's opinion and order of August 26, 1998, denying his motion for withdrawal of his guilty plea. *See* Notice of Motion for Reconsideration (filed Oct. 13, 1998). After a thorough and careful review of the record, my prior orders, and the submissions of Sanchez and the Government, I denied Sanchez's motion for reargument, concluding that I had not overlooked any matter or controlling decision. *See* Opinion of Oct. 23, 1998.

On October 8, 1998, the United States Probation Office ("Probation Office") pre-

pared a Presentence Investigation Report. *See* PSI (prepared Oct. 8, 1998, revised Oct. 23, 1998). Applying federal sentencing guideline § 2B5.1(a), Probation computed the base offense level to be nine. *See* PSI ¶ 18. "Because [Sanchez's] offense involved $100,000.00 worth of counterfeit currency, the offense level [was] increased six levels, pursuant to [United States Sentencing Guideline] § 2B5.1(b)(1),[5] which references the table at [USSG] § 2F1.1(b)(1)(G)." *See* PSI ¶ 19. No other adjustments were made to the offense level, resulting in a total offense level of 15. *See id.* ¶ 28. The Probation Officer computed Sanchez's criminal history category as "I." *Id.* ¶ 31.

By letter dated October 17, 1998,[6] Sanchez objected: (1) to the Probation Officer's recommendation that he be denied a two level reduction in his total offense level for acceptance of responsibility pursuant to USSG § 3E1.1,[7] and (2) to the Probation Officer's application of USSG § 2F1.1 in determining the total offense level. *See* Letter of Tomas Espinosa, Esq., to Susan M. Smalley, United States Probation Officer (dated Oct. 17, 1998). In addition to his objections to the total offense level calculation set forth in the PSI, Sanchez contended that he was entitled to a downward departure pursuant to USSG 5K2.0. *See id.*

On November 19, 1998, the day before Sanchez was scheduled to be sentenced, this Court filed an Opinion and Order overruling Sanchez's objections to the calculation of the total offense level, and denying his motion for a downward departure pursuant to USSG 5K2.0. *See United States v. Sanchez*, Criminal No. 96–646, unpublished slip op, at 4–5 (D.N.J. Nov.

---

5. The United States Sentencing Guidelines shall hereinafter be referred to as "USSG."

6. The Court treated the October 17, 1998, letter from Mr. Espinosa to Probation as a letter motion objecting to portions of the PSI and seeking downward departures.

7. Section 3E1.1(a) provides:

> If the defendant clearly demonstrates acceptance of responsibility for his offense, decrease the offense level by 2 levels.

USSG § 3E1.1.

19, 1998) (hereinafter "Opinion of Nov. 19, 1998"). In addition, I held:

> I make the following additional findings as to the appropriate Guideline calculation: (1) that the total offense level under the applicable Guidelines is 15; (2) that the criminal history category is I; (3) that the appropriate range for custodial sentence, pursuant to the Sentencing Table of Chapter 5, Part A of the Guidelines, is 18 to 24 months; (4) that the appropriate range for supervised release, pursuant to USSG §§ 5D1.1–2, is 2 to 3 years; (5) that, pursuant to USSG § 5E1.2, the appropriate range for the imposition of a fine is between $4,000 and $40,000; and (6) that the special assessment, pursuant to USSG § 5E1.3 and 18 U.S.C. § 3013, is $100.

*See id.* at 30.

On that same day, the Court received a letter from counsel for Sanchez, informing me that Sanchez had been "hospitalized in Cabrini's [sic] mental hospital in New York" because he had been entertaining suicidal ideations. *See* Letter to the Court from Tomas Espinosa, Esq. (dated Nov. 18, 1998). Mr. Espinosa further informed the Court:

> I am alerting the Court to the possibility that the defendant may in all likelihood not appear on the sentencing date as a direct consequence of his condition and I want to avoid that he may be arrested and his bail forfeited without no [sic] fault by him. I do not know what is [sic] his prognosis nor the length of time that he will be confine [sic] to the care of the hospital. . . . From my conversation with Dr. [Nicholas] Marchese, ["a Psychiatrist who is the Director of Psychiatry at Saint Francis Community Health Center, in Jersey City[,] New Jersey,"] [G]uido Sanchez is a very sick man and the derangement he is experiencing is the direct consequence of having to go to jail for a crime he did not commit and this without the benefit of a trial of his peers. This is not a delay tactic (such a silly tactic would be ridiculous any way

[sic] and counterproductive if it were used by any defendant).

*See id.* In addition, Mr. Espinosa submitted two letters to the Court from Dr. Carlo Filiaci, an attending physician at Cabrini Medical Center, certifying that Sanchez had been admitted to Cabrini Medical Center's psychiatric unit. *See* Letters to the Court from Dr. Carlo Filiaci (dated Nov. 17, 1998).

Enclosed with Mr. Espinosa's letter of November 18, 1998, was a copy of a psychiatric report prepared by Dr. Nicholas A. Marchese, M.D., a psychiatrist and former Director of Psychiatry for St. Francis Community Health Center, located in Jersey City, New Jersey. *See* Letter to the Court from Tomas Espinosa, Esq. (dated Nov. 18, 1998), Exh. A (Report of Dr. Nicholas A. Marchese, dated Nov. 13, 1998) (hereinafter, "Marchese Report"). In the report, Dr. Marchese diagnosed Sanchez as suffering from a "Major Depressive Disorder—Recurrent Type Accompanied by Anxiety." *See* Marchese Report at 3. Regarding Sanchez's mental status, Dr. Marchese reported:

> [Sanchez's] mood was very depressed accompanied by a pervasive loss of interest in almost all activities except his thoughts of impending and overwhelming catastrophic doom and thoughts of annihilation. He also complained of appetite disturbances, sleep disturbances, nightmares, decreased energy, feelings of worthlessness, difficulties in concentration and thinking. Thoughts of self destruction were also quite evident although he expressed no plans for doing anything at this time. . . . [S]low intellectual functioning and forgetfulness was [sic] quite evident. His anxieties were noted by . . . objective signs of restlessness, agitation, twitching, dilated pupils, dry mouth, and tremors of his hands and lips.

*See id.* at 2. Based on his observations, Dr. Marchese offered the following opinion:

> [Sanchez] is presently very frightened and nervous. He is undergoing grief,

anxiety, worry, mortification, shock, humiliation, indignity, embarrassment, apprehension, terror and ordeal. His present ideations of self destruction should be immediately addressed and if necessary be hospitalized for treatment by a Psychiatrist. [Sanchez's] emotional and intellectual capacity is presently unable to confront the realities of his present predicament.

*See id.* at 3. Dr. Marchese further opined that "a prison sentence would produce severe psychological consequences in this person." *See id.*

After considering the psychiatric evaluations submitted by counsel for Sanchez, and receiving no opposition from the Government, on December 10, 1998, in accordance with 18 U.S.C. §§ 3552, 4244, 4247, this Court ordered Sanchez to "submit to a psychiatric/psychological examination, including an evaluation of his mental competency for further proceedings in this matter, to be conducted by a licensed or certified psychiatrist or clinical psychologist as required by 18 U.S.C. § 4247(b)[.]" *See* Order of the Court (filed Dec. 10, 1998). I further ordered that "upon completion of the examination, and submission of the examining physician's report, the Court shall schedule and hold a hearing ... to determine whether [Sanchez] is suffering from a mental disease or defect for the treatment of which he is in need of ... treatment in a suitable facility, pursuant to 18 U.S.C. §§ 4244, 4247, pending final sentence." *Id.*

On December 16, 1998, in accordance with the Court's December 10, 1998, Order, Dr. Konstantin Mouhtis, Ph.D., a licensed psychologist and Clinical Director of the Human Growth Center of New Jersey, located in Bloomfield, New Jersey, evaluated Sanchez. *See* Report of Dr. Konstatin Mouhtis (dated Dec. 21, 1998) (hereinafter, "Mouhtis Report"). Sanchez "was seen at pre-trial services, and his daughter and wife were with him." *See id.* at 1. After reporting that he observed

symptoms similar to those reported by Dr. Marchese, Dr. Mouhtis opined:

It is clear that Mr. Sanchez is suffering from a single episode of major depression as a result of his upcoming sentencing. He does not have a previous psychiatric history, and has worked as a longshoreman for the past thirty years. Currently Mr. Sanchez is stabilized on medication [ (Trazondone, Prozac and Ambien),] ... however, I believe it is vital that he continue this medication and that he also receive psychotherapy after he is sentenced. It is my opinion that Mr. Sanchez can understand the charges he faces and is mentally able to go through any legal matter and assist in his own defense.

*See* Mouhtis Report at 2. Dr. Mouhtis did not administer any diagnostic tests.

B. *Testimony Presented at the March 12, 1999, Competency Hearing*

On March 12, 1998, the Court conducted a competency hearing pursuant to 18 U.S.C. §§ 4244, 4247. *See* Transcript (dated Mar. 12, 1999). The Court heard testimony from Yomayra Garcia, Sanchez's adult daughter, Dr. Marchese, and Dr. Mouhtis. *See id.*

Yomayra Garcia testified that in October, 1998, her father's mental condition deteriorated dramatically. *See id.* She testified that her father, who was employed as a longshoreman, was forced to stop working because his depressed and listless condition made him a safety hazard to his co-workers. *See id.* Ms. Garcia further testified that, about this time, he stopped bathing regularly, spent most of his days in bed lamenting his fate, and staring at the ceiling. According to Ms. Garcia, her father became increasingly suspicious of strangers and family members alike, often refusing to eat the same meals as his wife and children, hiding behind shuttered windows, and even boarding up the windows of his bedroom to keep the Government from "coming to get him

or shooting him through the windows." *See id.*

In addition, Ms. Garcia testified that she was present at Dr. Mouhtis' examination of her father. *See* Transcript. She stated that she acted as an interpreter during Dr. Mouhtis' evaluation of Sanchez because: (1) Sanchez does not understand English; (2) Dr. Mouhtis does not speak Spanish; and (3) the Government failed to provide Dr. Mouhtis with an independent Spanish-language interpreter. *See id.* Ms. Garcia further testified that when she translated Dr. Mouhtis' questions into Spanish, her father had little or no reaction, and his answers, if any, were not responsive to the questions. *See id.* To facilitate the interview, Ms. Garcia answered Dr. Mouhtis' questions on behalf of her father, volunteering information about his mood, behavior and family and work history. *See id.* Ms. Garcia stated that, because of the language barrier, Dr. Mouhtis interacted almost exclusively with her, not Sanchez. *See id.*

At the conclusion of Ms. Garcia's testimony, defense counsel called Dr. Marchese to the stand. *See* Transcript. Dr. Marchese, who speaks Spanish, testified that he interviewed Sanchez directly for approximately one hour on five separate occasions between November, 1998, and March, 1999. *See id.* Although Dr. Marchese testified that Sanchez "appeared to understand [his questions,]" Dr. Marchese further testified:

> [Sanchez] was under severe, severe pressure.... I had to ask him the question a number of times and he couldn't provide me with an exact answer, that's when I had to turn to his wife or daughter [for clarification].

*Id.*

In addition, Dr. Marchese stated that over time he observed a severe psychological deterioration in Sanchez. *See id.* On direct examination, Dr. Marchese testified:

Q. [By Mr. Espinosa] ... Can you express to the court what you mean by severe psychological deterioration?

. . . . .

A. Yes. Well, he was not functioning. He was not able to understand, he was not relevant, he certainly could not make any sense of what was going on. It was rather chaotic, his thinking was chaotic, there was no relevancy in his thinking or communication.

. . . . .

Q. Did [sic] you believe that Guido Sanchez can make a rational decision ... about this whole proceeding here and assist me in helping him through the process?

A. I do not believe that, no.... [H]e has a significant amount of cognitive dysfunction and he's not relevant.

. . . . .

THE COURT: Are you saying he has no ... intellectual capability of understanding what's going on?

THE WITNESS: He really does not.

Q. [By Mr. Espinosa] [H]ow is [Sanchez's] mood?

A. His mood is always depressed, flat, and not consonant within environmental stimuli and he's a man that's under very severe stress.

Q. Has he expressed to you a feeling of worthlessness and suicide?

A. Yes, he has ... [H]e doesn't see that there is any hope, any future for him, he feels helpless, hopeless and futureless.... [H]e feels absolutely dominated by feelings of inability to function.... He can't concentrate, he can't make a decision.

*See* Transcript at 47–51.

The Court asked Dr. Marchese whether he agreed with the opinion Dr. Mouhtis set forth in his December 16, 1998, report. *See id.* The Court inquired:

THE COURT: ... [Y]ou don't really disagree with Doctor Mouhtis, at least to

the extent that he says that the condition in which Mr. Sanchez finds himself is a result of the pending legal problems he has and the pending sentencing? ... You agree?

THE WITNESS: Yes, indeed.

THE COURT: You just disagree with him about whether he can understand the nature of the proceedings.

THE WITNESS: Absolutely.

THE COURT: And whether he can communicate effectively and be of assistance to his attorney.

THE WITNESS: Correct.

*See* Transcript at 55.

Dr. Marchese also discussed the possibility of whether Sanchez could be malingering. Dr. Marchese testified:

A. ... [T]hat was a question that comes up in my mind, and I cannot believe that anybody could be malingering over this extended period of time. And I'm doing this for 43 years now and I doubt that he can fool me.

Q. [By Mr. Espinosa] Why do you say that?

A. Because of the consistency of his behavior. As a matter of fact, on my last visit with him, he's boarding up the windows now, he screwed and nailed boards across his windows. He believes he's being ... victimized, that he's being followed.

THE COURT: He has paranoid delusions, is that what you see?

THE WITNESS: Oh, yeah, he's got delusional symptomatologies.

THE COURT: So, in your view this is not malingering behavior?

THE WITNESS: ... I do not believe that.

THE COURT: In 43 years, Doctor, have you encountered malingerers?

THE WITNESS: I have, yes[,] ... in auto injur[y] [cases].

*See* Transcript at 56–57.

On cross examination, the Government asked Dr. Marchese whether learning that he would not have to go to prison would improve Sanchez's condition. Dr. Marchese responded: "I don't know whether ... you tell[ing] him right now that he's going to be released ... is going to affect him negatively or positively." *See* Transcript at 69.

At the conclusion of Dr. Marchese's testimony, the Government called Dr. Konstantin Mouhtis to testify. First, Dr. Mouhtis explained his methods:

I did not know that Mr. Sanchez did not have a good command of the English language. Luckily his family, particularly his daughter, [Ms. Garcia,] was there and was able to interpret.... I followed a protocol of asking about the presenting problem. I asked some relevant medical history, past psychiatric history and, more importantly, I gathered current symptomatology to draw a conclusion as to what Mr. Sanchez may be suffering from.

*See* Transcript at 83. Dr. Mouhtis admitted that he relied on the PSI and Dr. Marchese's report in gathering much of Sanchez's background information. *See id.* at 80, 83.

Because Ms. Garcia was providing the English-language responses to Dr. Mouhtis' questions, Dr. Mouhtis testified that he was not "confident" that Sanchez was responding to his questions. *See id.* at 85. Dr. Mouhtis stated:

Q. [By Mr. McCarren] ... I understand you don't speak Spanish, but during this conversation did [Sanchez] appear to be responding to his daughter in a coherent fashion based on your questions?

A. ... [H]is body language would indicate that he wasn't. I'm not sure what he was responding back, I could only go by what his daughter was interpreting....

.     .     .     .     .

Q. [D]id you seek to find any information about his understanding of the legal proceedings?

A. Yes, I did. . . .

Q. Now, are you confident that [these responses were] information that [Sanchez] was supplying?

A. Not that confident. Only because his daughter was able to relay it, I'm not sure again what he was saying through his daughter.

*See id.* at 84–85.

During direct examination, Dr. Mouhtis opined as to Sanchez's mental condition:

Q. [D]id you ultimately reach a conclusion based on your interview, your review of the documents, did you reach a conclusion as to what the diagnosis was?

A. Well, certainly his symptoms were very severe and they followed the diagnosis of a major depressive disorder, single episode. I say single episode only because there were no prior psychiatric problems. And if you have chronicity or multiple episodes, there would have to be at least a two month break symptom free before you could say you have multi-episodes. . . .

THE COURT: There is no question in your mind though that . . . at the time you examined and interviewed [Sanchez] that he was suffering from a major depressive disorder.

THE WITNESS: Right, there is no question. . . .

Q. [By Mr. McCarren] Now, despite this depression, did you reach a conclusion as to whether the defendant could understand the nature of the charges against him and the legal proceedings?

A. At the time I felt that he could because I felt that he could follow a natural sequence as to what was making him depressed. . . .

.   .   .   .   .

Q. Now, you reached the conclusion that he would be able to assist his attor-

ney. What did you base that conclusion on?

A. Simply that he was able to follow a logical pattern of what got him into his predicament. . . . If somebody is not truly aware of what's happening and can't assist, I'm not sure they would . . . be thinking that way.

.   .   .   .   .

THE COURT: . . . [D]o you think [Sanchez is] capable of understanding what his attorney has to say to him?

THE WITNESS: At the time when I saw him in December I felt that he could, I can't judge right now if he can. I would have to talk to him, interview him in some way. . . .

THE COURT: In what respect, if any, do you disagree with Doctor Marchese?

THE WITNESS: Nothing except again I don't know how Doctor Marchese felt about Mr. Sanchez in December in his ability to be able to communicate with his attorney. It seems like right now what Doctor Marchese is saying is that he had no ability and that he cannot. Other than that, I don't disagree at all, I think we both have the same opinion.

THE COURT: You just don't know today whether he's capable of communicating effectively.

THE WITNESS: I do not. . . .

*See* Transcript at 87–98.

On cross-examination, Dr. Mouhtis stated that Sanchez's condition appeared to have deteriorated since December, 1998. *See id.* at 100. In addition, Dr. Mouhtis stated that the logical sequencing of events by Sanchez during the December 16, 1998, interview, was relayed to him by Ms. Garcia, not by Sanchez. *See id.* at 102.

## II. DISCUSSION

A. *Legal Standard Governing the Determination of a Convicted Person's Competency to Be Sentenced Pursuant to 18 U.S.C. § 4244*

Section 4244(d) of Title 18 of the United States Code governs determinations of a

convicted person's competency to be sentenced. *See* 18 U.S.C. § 4244(d). Section 4244(d) provides:

> If, after [a] hearing [pursuant to § 4247], the court finds by a preponderance of the evidence that the defendant is *presently suffering from a mental disease or defect and that he should, in lieu of being sentenced to imprisonment, be committed to a suitable facility for care or treatment,* the court shall commit the defendant to the custody of the Attorney General. The Attorney General shall hospitalize the defendant for care or treatment in a suitable facility. Such a commitment constitutes a provisional sentence of imprisonment to the maximum term authorized by law for the offense for which the defendant was found guilty.

*See* 18 U.S.C. § 4244(d) (emphasis added); *see also* 18 U.S.C. § 4247. The statute gives little guidance to District Courts faced with deciding whether a convicted person is "presently suffering from a mental disease or defect." *See* 18 U.S.C. § 4244. Courts considering the legal standard to be applied have reached divergent conclusions. *Compare United States v. Abou–Kassem,* 78 F.3d 161 (5th Cir.1996), *with United States v. Gigante,* 996 F.Supp. 194 (E.D.N.Y.1998); *see also United States v. Askari,* 159 F.3d 774, 776 n. 2 (3d Cir.1998). Therefore, before this Court can decide whether Sanchez is competent to be sentenced, I must first decide the appropriate legal standard to be applied in making such a determination.

The Government contends that the standard to be applied in determining whether a convicted person is competent to be sentenced is less exacting than the legal standard applied in determining whether an accused is competent to stand trial. *See* Government Brief (filed Feb. 17, 1998) at 4 ("Gov.Brief"); *see* 18 U.S.C. § 4241 (statute governing determinations of whether an accused is competent to stand trial).[8] In other words, the Government contends that § 4244 permits a District Court to sentence a convicted person to imprisonment, although that same person would be incompetent to stand trial under § 4241. *See* Gov. Brief at 4. In support of its position, the Government relies upon *United States v. Abou–Kassem,* 78 F.3d 161 (5th Cir.), *cert. denied,* 519 U.S. 818, 117 S.Ct. 70, 136 L.Ed.2d 30 (1996).

In *Abou–Kassem,* the Fifth Circuit held that the standard to be applied under § 4244(d) is less demanding than the standard which is applied when determining whether a defendant is competent to stand trial under 18 U.S.C. § 4241(d). *See Abou–Kassem,* 78 F.3d at 165. Under § 4241(d), a criminal defendant is incompetent to stand trial if he is "unable to understand the nature and consequence of the proceedings against him *or* to assist properly in his defense." *See* 18 U.S.C. § 4241(d) (emphasis added); *but see United States v. Leggett,* 162 F.3d 237, 242 (3d Cir.1998) (stating that, under § 4241, due process requires a finding that a defendant "has sufficient ability to consult with his lawyer with a reasonable degree of rational understanding *and* whether he has a

---

**8.** Section 4241 provides, in relevant part:

At any time after the commencement of a prosecution for an offense *and prior to the sentencing of the defendant,* the defendant or the attorney for the Government may file a motion for a hearing to determine the mental competency of the defendant. The court shall grant the motion, or shall order such a hearing on its own motion, if there is reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense.... If, after the hearing, the court finds by a preponderance of the evidence that the defendant is presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense, the court shall commit the defendant to the custody of the Attorney General.

*See* 18 U.S.C. § 4241(a)-(d) (emphasis added).

rational as well as factual understanding of the proceedings against him") (citing *Drope v. Missouri*, 420 U.S. 162, 172, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975), and *Dusky v. United States*, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960)) (emphasis added). The Fifth Circuit determined that, because the language of § 4244 is much less specific regarding the findings a court must make, "[t]he standard under section 4241 asks more and is significantly more onerous than the relevant test under section 4244." *Abou–Kassem*, 78 F.3d at 165; *compare* 18 U.S.C. § 4241(d), *with* 18 U.S.C. § 4244(d).

The Fifth Circuit, however, did not address the Due Process issues arising from a criminal defendant's competency during a criminal proceeding, as discussed in *Drope* and *Dusky*. *AbouKassem*, 78 F.3d at 165. The § 4244 issue in *Abou–Kassem* did not arise in the context of a due process analysis. *See id.* Rather, it arose in the context of an equal protection challenge to the application of the statute. *See id.* In fact, the Fifth Circuit specifically declined to engage in a due process analysis of § 4244 because it deemed the due process appeal to have been abandoned by the *pro se* litigant's failure to brief the issue. *See id.*

In conducting an equal protection analysis, however, the Fifth Circuit determined that applying a less stringent standard under § 4244 did not result in disparate treatment of similarly situated persons because: (1) pre-trial criminal defendants are not similarly situated with pre-sentence convicted persons; and (2) the government had legitimate interests in applying a lower standard under § 4244, namely, (a) "protecting mentally ill prisoners who might be at substantial risk if placed in the general population; [(b)] ensuring the safety of other inmates; and [(c)] providing humanitarian treatment for mentally ill inmates." *See id.*

In contrast, considering the due process rights of a convicted person at the time of sentencing, Senior District Judge Weinstein, in *United States v. Gigante*, 996 F.Supp. 194 (E.D.N.Y.1998), concluded that the Due Process Clause of the Fifth Amendment requires District Courts to apply the same standard in determining whether a defendant is competent to be sentenced, as applied in determining whether a defendant is competent to stand trial. *See Gigante*, 996 F.Supp. at 198.

Judge Weinstein held, based upon the Supreme Court's Due Process jurisprudence, that "[i]t must be concluded that the Constitution requires the *Dusky* standard to apply at the penalty phase of a prosecution." *Id.; see also Dusky*, 362 U.S. at 402, 80 S.Ct. 788. Judge Weinstein noted:

> The requirement that a defendant be competent during a criminal proceeding is predicated upon a defendant's right to due process. . . . [A] defendant is entitled to due process not only at trial, but at sentencing[, because] [s]entencing is a critical stage of the criminal proceeding. . . . [E]ven under the Federal Sentencing Guidelines where sentencing can be somewhat mechanical, a defendant should be as capable of defending himself with the aid of an attorney when facing his sentencer as when facing a jury.

*See Gigante*, 996 F.Supp. at 197–98 (citations omitted); *see also Gardner v. Florida*, 430 U.S. 349, 358, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977) (stating that "it is now clear that the sentencing process . . . must satisfy the requirements of the Due Process Clause"); *cf. Drope*, 420 U.S. at 171–72, 95 S.Ct. 896 (finding that the prohibition against subjecting an incompetent person to criminal proceedings is required by Due Process and "is fundamental to an adversary system of justice"); *cf. also Godinez v. Moran*, 509 U.S. 389, 402, 113 S.Ct. 2680, 125 L.Ed.2d 321 (1993) (stating that "[r]equiring that a criminal defendant be competent has a modest aim: It seeks to ensure that he had the capacity to understand the proceedings and to assist counsel").

The *Gigante* court conducted its competency inquiry under 18 U.S.C. § 4241, which provides in relevant part:

> *At any time* after the commencement of a prosecution for an offense and *prior to the sentencing of the defendant,* the defendant or the attorney for the Government may file a motion for a hearing to determine the mental competency of the defendant.

18 U.S.C. § 4241(a) (emphasis added). Presently, this Court's competency determination is proceeding pursuant to 18 U.S.C. § 4244, which provides in relevant part:

> A defendant found guilty of an offense, or the attorney for the Government, may, ... *prior to the time the defendant is sentenced,* file a motion for a hearing on the present mental condition of the defendant if the motion is supported by substantial information indicating that the defendant may presently be suffering from a mental disease or defect for the treatment of which he is in need of custody for care or treatment in a suitable facility.

18 U.S.C. § 4244(a) (emphasis added). Given that the statutes overlap to cover competency determinations prior to sentencing, and that the *Gigante* court specifically considered the defendant's competency to be sentenced after he had been convicted, the *Gigante* court's § 4241 competency determination is relevant to this Court's § 4244 competency determination. Judge Weinstein's analysis is especially relevant because the competency determination in *Gigante* was conducted at the same procedural point as the competency determination to be made in this case, specifically, after conviction, but prior to sentencing. *See* 996 F.Supp. at 196. To apply a less exacting legal standard under § 4244, than under § 4241, in determining the competency of a defendant after conviction, but prior to sentencing, as the Government contends, would unreasonably result in inconsistent outcomes. For example, a convicted defendant suffering from a mental disease or defect could be found competent to be sentenced under § 4244, while being found incompetent to be sentenced under § 4241. It certainly cannot be the case that a criminal defendant's constitutionally protected right to due process depends upon which statute a Court relies in determining his or her competency to sentenced.

■ Thus, because the *Abou–Kassem* court specifically refused to engage in a due process analysis, as well as the long-standing tradition of Anglo–American jurisprudence against subjecting an incompetent person to the rigors of criminal proceedings, *see Drope,* 420 U.S. at 162, 95 S.Ct. 896 (citing 4 *Blackstone Commentaries* at 24), I hold that the Due Process Clause of the Fifth Amendment requires this Court to apply the same legal standard to determine competency pursuant to § 4244, as this Court would apply in a competency proceeding pursuant to § 4241. In other words, the *Dusky* standard of competence, which requires that a defendant "ha[ve] sufficient ability to consult with his lawyer with a reasonable degree of rational understanding and ... [that] he ha[ve] a rational as well as factual understanding of the proceedings against him," is the appropriate standard to apply in determining whether a convicted person is competent to be sentenced. *Dusky,* 362 U.S. at 402, 80 S.Ct. 788. In so holding, I simply adopt and expressly apply a rule of law that courts in this Circuit have implicitly applied. *See United States v. Askari,* 159 F.3d 774, 776 n. 2 (3d Cir.1998) (noting that, in applying § 4244(d), District Court found a criminal defendant incompetent to be sentenced because he was "[un]able to cooperate with his attorney").

■ The recent Third Circuit case of *United States v. Leggett,* which applied the *Dusky* standard under § 4241, is instructive in the application of § 4244. In *Leggett,* the Third Circuit wrote:

> A [criminal] defendant is competent ... if (1) the defendant has the present ability to consult with defense counsel with a

reasonable degree of rational understanding and (2) the defendant has a rational as well as factual understanding of the proceedings. In determining whether a defendant satisfies this two-prong test, a court must consider a number of factors, including: evidence of a defendant's irrational behavior, the defendant's demeanor ..., and any prior medical opinion on [the] competence [of the defendant].... A court must ... look at the unique circumstances of the case and decide whether the defendant (1) has the capacity to assist in her or his own defense and (2) comprehends the nature and possible consequences of [the criminal proceeding].

See *Leggett*, 162 F.3d at 242 (citations, internal quotations and additional alterations omitted).[9]

### B. *Allocation of the Burden of Proof*

Sections 4241 and 4244, "providing for competency hearings do[ ] not allocate the burden of proof, and ... the Supreme Court ... has [not] decided as a matter of statutory construction whether the government or defendant bears the burden." *United States v. Nichols*, 56 F.3d 403, 410 (2d Cir.1995); *see also Medina v. California*, 505 U.S. 437, 112 S.Ct. 2572, 120 L.Ed.2d 353 (1992). In addressing this issue, in *United States v. Velasquez*, 885 F.2d 1076 (3d Cir.1989), the Third Circuit held that "[a]t a competency hearing, the Government has the burden to prove the defendant's competency." *Id.* at 1089 (cit-

ing *United States v. DiGilio*, 538 F.2d 972, 988 (3d Cir.1976)).

Since the Supreme Court's decision in *Cooper v. Oklahoma*, 517 U.S. 348, 116 S.Ct. 1373, 134 L.Ed.2d 498 (1996), however, courts outside this Circuit have cited *Cooper* for the proposition that "Congress has directed that [the defendant] in a federal [criminal proceeding] must prove incompetence by a preponderance of the evidence." *See Gigante*, 996 F.Supp. at 199 (quoting *Cooper*, 517 U.S. at 362, 116 S.Ct. 1373); *see, e.g., United States v. Rudisill*, 43 F.Supp.2d 1, 1999 WL 169792, at *3 (D.D.C.1999). Arguably, this language from *Cooper* is *dicta* because the case dealt with state burdens of proof in competency hearings, not with the federal statutes establishing the standards and procedures for competency hearings in federal court. *See Cooper*, 517 U.S. at 362, 116 S.Ct. 1373; *see also* 18 U.S.C. §§ 4241, 4244, 4247. Thus, the continued viability of the Third Circuit's allocation of the burden of proof to the Government in *Velasquez* depends on the precedential value of the quoted portion of *Cooper*.

In determining Sanchez's competency to be sentenced, however, I need not resolve this issue. This is not a "case[ ] where the evidence is in equipoise; that is, where the evidence that a defendant is competent is just as strong as the evidence that he is incompetent." *Nichols*, 56 F.3d at 410 (quoting *Medina*, 505 U.S. at 449, 112 S.Ct. 2572). Rather, the evidence presented to this Court at the competency hearing

**9.** The Third Circuit's discussion in *Leggett* arose in the context of an appeal from a District Court's finding that there was not reasonable cause shown to require a competency hearing. 162 F.3d at 242. Under §§ 4241 and 4244, a District Court must make two findings. First, a court must find that there is reasonable cause to suspect that the defendant is incompetent to be subjected to a criminal proceeding, thus necessitating a hearing to determine the defendant's mental state. *See* 18 U.S.C. §§ 4241(a), 4244(a). Second, after the hearing, a District Court must determine by a preponderance of the evidence whether the defendant is in fact incompetent to be tried or sentenced. *See* 18

U.S.C. §§ 4241(d), 4244(d). In making these findings, a District Court applies the same legal standard, namely, the *Dusky* standard. The difference between the two findings is in the standard of proof applied, "reasonable cause" as opposed to "by a preponderance of the evidence." *Compare* 18 U.S.C. §§ 4241(a), 4244(a), *with* 18 U.S.C. §§ 4241(d), 4244(d). Therefore, the *Dusky* standard applied by the Third Circuit in *Leggett*, to determine whether there was reasonable cause to hold a competency hearing, is the same due process standard applied in determining whether a defendant is competent to be tried or sentenced. *See id.*

conclusively established Sanchez's incompetence. Therefore, the allocation of the burden of proof to Sanchez, in contravention of *Velasquez*, would not alter my conclusion, discussed below, that Sanchez is incompetent to be sentenced at this time.

### C. *Sanchez is Incompetent to Be Sentenced*

The testimony of Drs. Marchese and Mouhtis demonstrates that both agree that Sanchez is "presently suffering from a mental disease or defect[,]" namely a major depressive disorder. *See* Transcript; *compare* Marchese Report, *with* Mouhtis Report. Both Drs. Marchese and Mouhtis observed the same symptomatology, specifically: anxiety, crying episodes, depressed mood, feelings of hopelessness, impaired concentration, poor personal hygiene, impaired memory, irrational cognition, paranoid delusions, and most alarmingly, suicidal ideation. *See* Mouhtis Report at 2–4; *see also* Marchese Report; Transcript at 52 (Dr. Marchese testifying that Sanchez "could be a danger to himself under stress" and become suicidal). Both agreed that Sanchez required intensive counseling, psychotherapy, drug therapy, as well as monitoring in a suitable environment. *See* Mouhtis Report; Transcript at 51–52, 94–96.

Indeed, Drs. Marchese and Mouhtis agree in every respect, with one exception. In his December, 1998, report, Dr. Mouhtis opined that Sanchez could "understand the charges he faces and... assist in his own defense." *See* Mouhtis Report at 2; Transcript at 98. Dr. Marchese, however, opined that Sanchez was presently unable to comprehend the nature and consequences of the pending sentencing, as well as incapable of cooperating with his counsel, Mr. Espinosa. *See* Transcript; *see also* Marchese Report.

On this ultimate issue, I find that Dr. Mouhtis's opinion, that Sanchez is competent to be sentenced, is inconsistent with his own testimony, as well as the testimony of Dr. Marchese and Ms. Garcia. First, in response to a question from the Court, Dr. Mouhtis stated that he "can't judge right now if [Sanchez is capable of understanding what his attorney has to say to him]." *See* Transcript at 98.

Second, Dr. Mouhtis testified that, after conducting a single forty-five minute interview, he determined that Sanchez was competent based on his ability to articulate in a logical manner the sequence of events causing his present mental condition. *See* Transcript at 84–85. Dr. Mouhtis, however, admitted that he obtained much of the background information about Sanchez's arrest and conviction from the PSI and Sanchez's family. In addition, he testified that he was unsure whether the responses to his questions during the interview were Sanchez's responses, or those of his daughter, Ms Garcia.

On this issue, Ms. Garcia's testimony was unequivocal and credible. She stated that her father had little or no reaction to Dr. Mouhtis' translated questions, and that his answers, if any, were not responsive to the questions. *See* Transcript. Furthermore, she testified that she answered Dr. Mouhtis' questions on behalf of her father, volunteering information about his mood, behavior, legal problems and family and work history. *See id.*

Given Dr. Mouhtis' inability to speak Spanish, this Court is left to speculate whether Dr. Mouhtis' opinion, finding Sanchez competent to be sentenced, was premised on his evaluation of Sanchez alone, or on his evaluation of Ms. Garcia's responses on behalf of Sanchez. Because Dr. Mouhtis based his finding of competency on Sanchez's ability to "follow a natural sequence as to what was making him depressed," and because, more likely than not, this "natural sequence" was the product of Ms. Garcia's responses to Dr. Mouhtis' questions and not Sanchez's responses, I find that Dr. Mouhtis' opinion as to Sanchez's competency is unreliable under the circumstances.

In comparison, Dr. Marchese, who speaks Spanish, interviewed and evaluated Sanchez on five separate occasions over a five-month period. Dr. Marchese testified that, during that time, he observed such consistency in Sanchez's behavior that he ruled out the possibility of malingering. *See* Transcript at 56–57. Based on Sanchez's consistent symptomatology, Dr. Marchese concluded that Sanchez could not understand the nature of the proceedings or be of assistance to his attorney. *See id.* at 55.

■ Considering the fact that Drs. Marchese and Mouhtis agree that Sanchez is presently suffering from a significant mental disorder requiring psychotherapy, drug therapy, and monitoring in a suitable environment, and given that Dr. Mouhtis' ultimate opinion as to Sanchez's competency is unreliable in light of his inability to communicate directly with Sanchez, I find by a preponderance of the evidence that, at this time, Sanchez does not "ha[ve] sufficient ability to consult with his lawyer with a reasonable degree of rational understanding ... [and does not] ha[ve] a rational as well as factual understanding of the proceedings against him." *See Dusky,* 362 U.S. at 402, 80 S.Ct. 788; *accord Leggett,* 162 F.3d at 242; *Gigante,* 996 F.Supp. at 198. Accordingly, pursuant to 18 U.S.C. § 4244(d), I conclude that Sanchez is incompetent to be sentenced at this time, and that he should, in lieu of being sentenced to imprisonment, be committed to a suitable facility for care and treatment. *See* 18 U.S.C. § 4244(d); *see also United States v. Buker,* 902 F.2d 769, 769–70 (9th Cir.1990).

### D. *Provisional Sentencing Pursuant to 18 U.S.C. § 4244(d)*

Having found that Sanchez should be committed to a suitable facility for care and treatment, in lieu of being sentenced to imprisonment in accordance with the applicable USSG calculations, section 4244(d) provides that "the court shall commit the defendant to the custody of the Attorney General." *See* 18 U.S.C. § 4244(d). "Such a commitment constitutes a provisional sentence of imprisonment to the maximum term authorized by law for the offense for which the defendant was found guilty." *Id.*

Counsel for Sanchez contends that, under § 4244, this Court has the authority to order Sanchez to be confined to house arrest for a period of time equal to the custodial sentence required by the USSG calculations, 18 to 24 months. *See* Defendant's Brief (filed Mar. 2, 1999) at 2 ("Def.Brief"); *see also* Opinion of Nov. 19, 1998, at 30. In addition, counsel specifically contends:

Both experts, [Drs. Marchese and Mouhtis,] agreed that the best conditions [of confinement for Sanchez would] be one in which three elements were present: 1) Family support and care[;] 2) Medical [and] Psychiatric treatment with [ ]medication[; and] 3) Psychological treatment[.] The difference between [the experts' recommendations] is that the government expert believed that although [family support] is important, it is not always possible and that [Sanchez] will only benefit [from] a[ ] structured program (although he agreed that the setting must be loose and without pressure). Dr. Marchese ... testified that too structured [a] setting with high pressure would do irreparable damage [to Sanchez]. The Court is aware that there are different forms of commitment (electronic monitoring of the defendant in house by means of a leg bracelet). . . . If [Sanchez's] commitment to his house is ordered by the court and his medication and Psychiatric treatment is continued by Dr. Filiaci at Cabrini Hospital [on] an ambulatory basis, the psychological consultation can be continued by Dr. Marchese as he ... prefers. This novel confinement will meet the requirement of commitment, structure, no stress[ ], and family input that will help a man

that has been adjudged by Social Security to be permanently disabled.[10]

*See* Def. Brief at 2; *see also* Transcript at 51–52, 94–96 (commitment recommendations of Drs. Marchese and Mouhtis).

■ Contrary to counsel's contentions, this Court lacks the authority to commit Sanchez to house arrest for a period of time not to exceed twenty-four months. The phrase "maximum term authorized by law," used in § 4244(d), has been construed to mean the maximum sentence permitted by the criminal statute violated by the defendant, not the maximum sentence permitted by the Sentencing Guidelines. *See United States v. Moses*, 106 F.3d 1273 (6th Cir.1997); *United States v. Roberts*, 915 F.2d 889 (4th Cir.1990); *United States v. Gigante*, 989 F.Supp. 436 (E.D.N.Y.1998).

In this case, Sanchez pleaded guilty to a violation of 18 U.S.C. § 473, dealing in counterfeit United States obligations, which carries a ten year statutory maximum sentence. *See* 18 U.S.C. § 473. Thus, under the provisional sentencing provision of § 4244(d), Sanchez's commitment to the custody of the Attorney General for care and treatment shall be for ten years, or until such time as Sanchez is no longer suffering from his present mental disease or defect, whichever is shorter. *See* 18 U.S.C. §§ 4244(e), 4247(h).

■ Furthermore, § 4244(d) provides that upon a finding of incompetence, "the court shall commit the defendant to the custody of the Attorney General." *See* 18 U.S.C. § 4244(d). Courts construing this same language in § 4241(d) have held that "[t]he plain meaning of this phrase is ... that once a defendant is found incompetent ... a district judge has no discretion in whether or not to commit him." *United States v. Shawar*, 865 F.2d 856, 860–61 (7th Cir.1989) (finding the language mandatory and that "likelihood of recovery is not something to be considered by the district court in deciding whether to commit the defendant ..."); *see also United States v. Sherman*, 722 F.Supp. 504, 505 (N.D.Ill.1989), *aff'd,* 912 F.2d 907 (7th Cir. 1990); *see also* 18 U.S.C. §§ 4244(e), 4247(e)(1)(B).[11]

Although I am sympathetic to Sanchez's plight and aware that separation from his family may exacerbate his condition, I conclude that I have no authority under § 4244(d) to order Sanchez to house arrest. Rather, given the mandatory language of § 4244(d), this Court is required to commit Sanchez to the custody of the Attorney General, who "shall hospitalize the defendant for care or treatment in a suitable facility." *See* 18 U.S.C. § 4244(d). Accordingly, counsel's request that I order Sanchez to house arrest for no more than twenty-four months must be denied.

### III. CONCLUSION

For the reasons set forth above, the Court finds, by a preponderance of the evidence, that Sanchez is presently suffering from a mental disease or defect and that he should, in lieu of being sentenced to imprisonment, be committed to a suitable facility for care or treatment. *See* 18

---

10. In November, 1998, Sanchez applied to the Social Security Administration for disability benefits due to his mental incapacity. In March, 1999, his application for disability benefits was granted. *See* Transcript.

11. Section 4244(e) provides, in relevant part: When the director of the facility in which the defendant is hospitalized pursuant to subsection (d) determines that the defendant has recovered from his mental disease or defect to such an extent that he is no longer in need of custody for care or treatment in such a facility, he shall promptly file a certificate to that effect with the clerk of the court that ordered the commitment. *See* 18 U.S.C. § 4244(e); *see also* note 2 *supra*. Section 4247(e) provides, in relevant part:

The director of the facility in which a person is hospitalized pursuant to ... section ... 4244 shall prepare annual reports concerning the mental condition of the person and containing recommendations concerning the need for his continued hospitalization.

*See* 18 U.S.C. § 4247(e)(1)(B).

U.S.C. § 4244(d). Accordingly, the Court shall commit Sanchez to the custody of the Attorney General for hospitalization in a suitable facility. *See* 18 U.S.C. § 4244(d). In addition, in accordance with 18 U.S.C. §§ 473, 4244(d), the Court shall provisionally sentence Sanchez to commitment for a period of ten years, *see* 18 U.S.C. §§ 473, 4244(d), or until such time as the director of the facility in which Sanchez is hospitalized determines that Sanchez has recovered from his mental disease and is competent to be sentenced, *see* 18 U.S.C. § 4244(e), or until such time as this Court grants a motion by Sanchez for an order directing his discharge from hospitalization. *See* 18 U.S.C. § 4247(h).

The Court shall stay this provisional sentencing order for a period of thirty days from the entry of this Opinion and its accompanying Order to allow the Attorney General an opportunity to locate a facility suitable for Sanchez's treatment and care, and to afford Sanchez and his family the opportunity to put his affairs in order. The Court will enter an appropriate order.

### ORDER

This matter having come before the Court on its own motion to determine the competency of Defendant, Guido Sanchez, to be sentenced, pursuant to 18 U.S.C. §§ 3552, 4244, 4247, Faith S. Hochberg, Esq., United States Attorney, and Mark J. McCarren, Esq., Assistant United Sates Attorney, appearing on behalf of the Government, and Tomas Espinosa, Esq., appearing on behalf of the Defendant, Guido Sanchez; and,

The Court having considered the submissions of the parties, and the testimony taken at the competency hearing held March 12, 1999, for the reasons set forth in the OPINION filed concurrently with this ORDER;

IT IS, on this 19th day of April, 1999, hereby ORDERED that Defendant, Guido Sanchez, be committed to the custody of the Attorney General for hospitalization in a suitable facility as required by 18 U.S.C. § 4244(d); and,

IT IS further ORDERED that Defendant, Guido Sanchez, is provisionally sentenced to commitment for a period ten years, pursuant to 18 U.S.C. §§ 473, 4244(d), or until such time as the director of the facility in which Sanchez is hospitalized determines that Sanchez has recovered from his mental disease and is thereby competent to be sentenced in accordance with the terms of this Court's Opinion, filed November 19, 1998, *see* 18 U.S.C. § 4244(e), or until such time as this Court grants a motion by Sanchez for an order directing his discharge from hospitalization, *see* 18 U.S.C. § 4247(h); and,

IT IS further ORDERED that, pursuant to 18 U.S.C. §§ 4244(e), 4247(e)(1)(B), the director of the facility in which Sanchez is to be hospitalized shall prepare and file with this Court an annual report concerning the mental condition of Sanchez and containing recommendations concerning the need for his continued hospitalization; and,

IT IS further ORDERED that this Order shall be stayed for a period of thirty days, and at the expiration of that thirty day period, Defendant, Guido Sanchez, shall voluntarily surrender himself to the custody of the United States Attorney General, and the United States Bureau of Prisons.